# Producers' Wood Preserving Company v. Commissioners of Sewerage of Louisville.

(Decided December 21, 1928.)

WOODWARD, WARFIELD & HOBSON and C. C. GRASSHAM for appellant.

WM. T. BASKETT and GROVER G. SALES for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

This is an appeal in a condemnation proceeding. The appellant claimed $215,000 damages. The jury awarded it $49,590, and it has appealed. About the year 1921, the Producers' Wood Preserving Company was organized for the purpose of erecting and operating a creosoting plant, and for that purpose it purchased 170 acres of land adjacent to the city of Louisville, which cost it about $500 per acre. It then expended on this land about $416 an acre in grading and draining it, making a total expenditure of about $916 an acre, or $155,720 for the land alone. It constructed thereon a plant for creosoting railroad ties and other timbers, and, at the time this condemnation proceeding was begun, this property was probably worth $1,500,000.

The commissioners of sewerage of Louisville, finding it necessary to relieve insanitary conditions in Southern Louisville, condemned a right of way across this land for an open channel. The right of way varies in width from about 175 feet in some places to practically 300 feet in others, and it takes a total of 9.3 acres of land. There ran through this property a small stream known as Paddy's Run, which divided it into two tracts about 100 acres on one side and about 70 acres upon the other, and this sewer is constructed along the same general course formerly occupied by Paddy's Run.

It appears that in buying this land, laying out its plant, installing its pumps, boilers, engines, tanks for the storage of water and chemicals, piping, foundations, railroad sidings, and other things, that the appellant contemplated the installation of a four-cylinder plant, and made all these things large enough to do so, but it had not, at the time that this proceeding was started, occupied any portion of the 70 acres north of Paddy's Run with its manufacturing plant, but had conducted all its operations upon the south side of that stream, had only installed three units of the contemplated four, and this 70 acres was, at the time this proceeding was begun, used as a golf course, and the defendant, in the third paragraph of its answer, had alleged the following, which was stricken therefrom by order of the court:

"Defendant further says that its entire property from which the plaintiff seeks to condemn the tract of land described in its petition consists of approximately 170 acres of land, together with the complete manufacturing outfit thereon, designed and utilized for the purpose of treating railroad cross-ties, and other timber; that in order to conduct said business it is necessary to have a large storage yard where railroad cross-ties and other lumber can be seasoned before they are treated; that at present the defendant had three cylinders in which said timbers are treated, and the original plan and design of the property bought by the defendant for this purpose contemplated the installation of the fourth cylinder which will increase the production of said plant at least $33\frac{1}{3}\%$ and requires additional storage facilities, because all available land of the defendant is now consumed in the storage of said timber, except that between the proposed ditch and Bell's Lane, and

that it was the design and plan of the defendant to use said property for the storage of railroad cross-ties and other timbers to be treated when the business of the defendant developed to such an extent that it justified the use of same, and the defendant says that its business has now developed to such an extent that it is necessary to install a fourth cylinder in its manufacturing plant and to utilize all of the ground between the proposed ditch and Bell's Lane for the storage of untreated cross-ties and timber, and to run nine spur tracks across the line of the proposed ditch and into the section between the said ditch and Bell's Lane; that in order to do this it will be necessary if said ditch is constructed to bridge across the said ditch, and that the bridging across said ditch will be costly both in construction and maintenance, and will necessitate the handling of the cross-ties stored on the property between the ditch and Bell's Lane an extra switching movement across the entire width of said ditch which would be wholly unnecessary but for the construction of said ditch, and that the defendant cannot use the tract of land between Bell's Lane and said ditch without the construction of nine bridges across said ditch which will cost in excess of $100,000.00, and this defendant says that the damage to its plant as a whole, considering the cost of the construction of said bridges, the maintenance thereof, the added cost of transportating ties to and from the storage yard between Bell's Lane and said ditch, together with the separation of its property made by the construction of said ditch, will damage it to the extent of $175,-000.00.''

In its amended answer, the defendant had alleged that it would donate this right of way to the plaintiff, if the plaintiff would agree to construct a covered sewer or conduit, and the court struck this, but, as it is not seriously contended that that was error, and we do not think it was, we need give no further thought or time to that; but the matter copied above which was stricken from its answer presents a more serious question. To sustain the action of the trial court, the commissioners of sewerage place their principal reliance upon the case of Weiss v. Commissioners of Sewerage, 152 Ky. 552, 153 S. W.

967.   In that case, Weiss was conducting a chair factory, and the commissioners of sewerage sought to condemn a slice off of one end of the Weiss property to allow the construction of an improved channel for Beargrass creek. Weiss contended the strip proposed to be taken was much needed by him in his business, and offered proof that he had recently bought out another chair concern, and would especially need this ground in view of the proposed extension of his business.   The circuit court refused to allow Weiss to introduce evidence about what he proposed to do, but we have examined the record, and we find the court did permit him to introduce evidence to show his business had grown to a point where he needed other buildings, particularly a varnish room; that he did not have space elsewhere to construct such a room after the proposed strip was taken; allowed him to show the especial adaptability of this particular locality for a varnish room because it was remote from the street and street dusts; and allowed him to show the size of the building he needed.

In the case before us, the Producers' Wood Preserving Company in its evidence offered to show the number of railroad bridges it would be necessary for it to construct in order to enable it to have as reasonable use of this 70 acres after the ditch was constructed as it had before.   The court declined to admit it.   One witness had referred to the ground taken by the ditch, and said that it would take a space equal to 5 acres of storage ground, and the court directed the jury to dismiss that answer from ther memories, and to not give that any consideration when they deliberated on the case.   In the Weiss case, the property owned by Weiss consisted of a long strip running back to the center of Beargrass creek.   It was proposed in that case to improve the channel of Beargrass creek by straightening it, and giving it a bottom and side walls of concrete.   A portion of Weiss' property was taken for that purpose; but the difference between the Weiss case and this one is that the property of the Producers' Wood Preserving Company is cut in two, whereas in the Weiss case there was merely a portion of one end of his property taken.

In the formative period of our law, we said in the case of Forsythe v. Ellis, 27 Ky. (4 J. J. Marsh.) 298, 20 Am. Dec. 218: "The sovereign power of the state, with its 'eminent domain,' cannot take from the humblest

citizen, a particle of his property for public use, without allowing him just compensation." That was then, and is now, the underlying principle that must never be lost sight of in condemnation proceedings.

In the recent case of Kentucky Hydro-Electric Co. v. Reister, 216 Ky. 303, 287 S. W. 357, we said:

> "The appellees must be neither enriched nor impoverished by the taking of these easements. . . . In condemnation proceedings landowners should be allowed to show all facts existing before the taking which a seller would adduce in attempting to make a sale and all facts resulting from the taking to which a purchaser would call attention in an effort to beat down the price."

In Big Sandy & Ky R. Ry. Co. v. Stafford, 207 Ky. 272, 268 S. W. 1071, a strip of ground was taken from a narrow valley ranging in width from a few feet to 125 feet. It was shown in the evidence that a part of it was suitable for building lots, and that such lots were in demand, owing to the proximity of a coal mine and railway junction, and that to take the entire frontage for a depth of 10 feet would materially impair its value for such purposes, and we held such evidence was not objectionable.

In the case of Robb v. Maysville, Mt. Sterling Turnpike Co., 60 Ky. (3 Metc.) 117, we held the trial court erred in rejecting the evidence of Robb wherein he offered to prove what the land sought to be condemned was worth to him, though the court held that the fair market value of the quarry was the proper criterion for estimating the damages.

In the case of H. & N. R. Co. v. Dickerson, 56 Ky. (17 B. Mon.) 172 (66 Am. Dec. 148), we defined the measure of recovery by saying: "Its value to him, considering its relative position to his other land, and the other circumstances which may diminish or enhance that value, can alone afford him a just compensation for its loss. We referred to that case and quoted it with approval in the case of Richmond & L. T. Co. v. Madison Fiscal Court, 114 Ky. 351 [70 S. W. 1044, 24 Ky. Law Rep. 1260], and said the inquiry was, "What would be its value to him, situated as it is, if he were not the owner of it, but owned the adjacent property, under the circumstances as they now exist?"

Those cases have not been overruled, and the principles announced there are still regarded as sound; but those cases are not to be considered as authorizing the admission of evidence to show any sentimental value which the owner attaches to his property.

The expression "worth to him" and "value to him" in those opinions were but expressing "worth to his property" or "value to his property," and do not include any sentimental value not found in actual value under all the facts considered. The owner is entitled to show every cent of value his property as a whole had before the taking, and also to show, not only the value of the strip taken, but every lessening of value to what will be left after the taking that results from the taking. The owner's needs of it that are peculiar to him cannot be considered. See Board of Councilmen v. Brammell, 220 Ky. 132, 294 S. W. 1076, but the need of the property taken to give value to the property as a whole by its use therewith can be considered. The question is, how much does the taking lessen the value of the property as a whole? The hindrance or prevention of the completion of fully projected but only partially executed plans must be considered, but wholly unexecuted plans must not. After all, the touchstone is, the owner must be neither enriched nor impoverished, and in C., St. L. & N. O. R. Co. v. Rottgering, 83 S. W. 584, 26 Ky. Law Rep. 1167, we held the trial court did not err in permitting Rottgering to show that his land was only about a quarter of a mile from the corporate limits of Paducah, and that town lots had been laid off and were in the market for building purposes. In commenting on that, we said it was competent to prove the availability and adaptability of these lands for such use, as well as for gardening or farming purposes, citing authority.

In W. Va. P. & T. R. Co. v. Gibson, 94 Ky. 234, 21 S. W. 1055, 15 Ky. Law Rep. 7, we said:

"The rule seems to be that in estimating the value of property taken for public use the owner is entitled to the reasonable market value of the property, which value must be ascertained, not by what use the property has been actually applied to, but with reference to its availability and adaptability for valuable uses."

In the case of David v. L. & I. R. Co., 158 Ky. 721, 166 S. W. 230, we said:

> "We have recognized the propriety of admitting evidence with reference not only to the present uses of the property, but as to its adaptability for other uses to which it may be put in the immediate future."

We have concluded the trial court erred in striking from the defendant's answer the matter indicated above, and in excluding evidence showing the needs of the defendant for this property, and its peculiar adaptability, if any, to those needs. Speculative and chimerical uses are not to be considered, but we believe in this case that the use the Producers' Wood Preserving Company proposed to make of this land north of Paddy's Run was not speculative or chimerical. We are persuaded that in buying this 170 acres for the purpose that it did, in establishing its plant as we have heretofore set out in detail, with a view to the use and occupancy of all the tract, that the use it proposes to make of this land north of Paddy's Run was a part of that plan; that it had passed beyond the land of dreams and entered the realm of actuality. To use and occupy it, the Producers' Wood Preserving Company has only to install a fourth cylinder in its plant, to lay tracks across this property, and begin the use of it. It does not have to buy a single boiler, engine, pump, or any other fixture, as its existing plant was originally designed of sufficient size to take care of these. This was an industrial plant. That does not mean that just the buildings and machinery constituted the industrial plant, but the whole of this property was an industrial plant, including, not only the land occupied, but also the land available for expansion. Nothing else remained for it to do, except to add a fourth cylinder to the plant it had, and, when that fourth cylinder is added, it will then need this land north of Paddy's Run as a storage place for the timber awaiting treatment, for it appears from the evidence that this timber must be stacked and allowed to dry and season for several months before it is in condition for treatment.

We must bear in mind that this Wood Preserving Company does not enjoy the right of eminent domain. It must buy its property when it can. We feel that this, taken from the case of German Ins. Co. v. Com., 141 Ky.

606, 133 S. W. 793, should find a place at this point in this opinion:

"A corporation conducting a business of the character of that in which appellant is engaged, naturally expects its business to grow and expand from time to time, and, in building a home, it would be exercising but a short-sighted judgment if it did not make provision for the future by building a home large enough to take care of its expanding business, and hence, even if it should build a house larger and roomier than its present needs or interests require, it would be acting clearly within the exercise of its corporate right and power." To same effect is L. & N. R. Co. v. Com., 151 Ky. 325, 151 S. W. 934.

If a farmer had bought a tract of 160 acres in the woods, had cleared a space and built his house thereon, and his needed farm buildings, and it was proposed to construct such a sewer as this across his land, we would say that, in addition to the land taken, the jury should consider the shape of the pieces left, their condition, connection with and relation to each other, and the added burden of erecting and thereafter maintaining such improvements as would be made necessary to give to the farmer the same reasonable use and enjoyment of his property after the strip was taken that he had before. We would treat the 160 acres as a farm.

If an amusement company should conceive the idea of building a ball park, and, after it had gone to considerable expense in erecting its grandstand or stadium, if a strip of its land were taken, and the main part of its field were cut off thereby from this stadium, we would apply the same rule. We would treat it as a ball park.

There are certain classes of property, certain pieces of property that have a value as a whole, that are not for sale by piecemeal, and the courts have recognized that situation; for example, see the case of So. Ry. Co. v. City of Memphis, 126 Tenn. 267, 148 S. W. 662, 41 L. R. A. (N. S.) 828, Ann. Cas. 1913E, 153, wherein the city was condemning the railroad company's switch yard, with a view to devoting it to park purposes; in the case of Idaho-Western R. Co. v. Columbia Conference of Evangelical Lutheran Augustana Synod, 20 Idaho, 568, 119 P. 60, 38 L. R. A. (N. S.) 497, where a portion of a college campus was taken; in Sanitary District of Chicago v. Pittsburgh,

Ft. W. & C. R. Co., 216 Ill. 575, 75 N. E. 248, where a freight terminal was taken; in First Parish of Woburn v. Middlesex County, 7 Grey (Mass.) 106, where a church was taken; in Cochran v. Com., 175 Mass. 299, 56 N. E. 610, 78 Am. St. Rep. 491, where a mill site was taken. This property had a value as a manufacturing plant, just as a farm has a value as a farm, a ball park as a ball park, a freight yard as a freight yard, a church as a church, and a college campus as a college campus. Of course, the market value of a church could not be determined by saying just what somebody would give for that piece of property, because the ordinary citizen does not want to own a church, but what would a congregation that desired a church give for the church. In like manner, a college campus must have its value determined by what somebody who wanted a college would give for the property with that campus. There is nothing new in this. It is just an application of the old principles to the new conditions. These values are to be determined by what a purchaser who desires to buy such an industrial plant as this, but did not have to have it, would be willing to give for it, and what a seller that had such a plant and desired to sell it, but did not have to sell it, would be willing to take for it. Such a buyer and such a seller would consider the adaptability of the property to every reasonable purpose to which it could be devoted, and would, of course, include, perhaps to the exclusion of everything else, its value as an industrial plant, including its opportunity for expansion.

We find cases directly in point, for example, the case of St. Louis, Memphis & S. E. R. Co. v. Cont. Brick Co., 198 Mo. 698, 96 S. W. 1011. In that case a railroad company condemned a right of way through a tract of land that had been bought for, and a part of which was then being used for making brick, but the land taken by the railroad right of way was not then in use. Testimony was admitted showing the value of the land not then in use, for the future use of the brick company. The railroad company contended the admission of this evidence was error, but in disposing of that question the Missouri court said:

"The witnesses were estimating the value of the property as it was in November, 1902, when the railroad company invaded it. In estimating its then

value they took into account its capacity as a brick-making concern, not only as then developed, but also as it was then capable of being further developed, and, if it was true, as they said it was, that without increasing the machinery and equipment as then existed, except to build other kilns in a line to the east of those already there, the capacity of the plant could be doubled, that was a then present existing fact which gave a then present value to the property, and a destruction of it was a depreciation of its then value. Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206; Mississippi River Bridge Co. v. Ring, 58 Mo. 491, 496. There was no error in the court's ruling on that point."

A similar ruling will be found in Jeffrey et al. v. Osborne et al., 145 Wis. 351, 129 N. W. 931, where a portion of a manufacturing plant devoted to the manufacturing of automobiles was taken, and in the case of David Bradley Mfg. Co. v. Chicago & So. Traction Co., 229 Ill. 170, 82 N. E. 210. We must not lose sight of this fact, that in condemnation cases the owner of the property taken is not required to make any pecuniary sacrifice whatever. The error of the court in striking the above matter from the answer of the defendant persisted throughout the record. One of the most valuable assets of this plant was its room for expansion. That was the first point to which the attention of a prospective purchaser would have been called, and, by the court's ruling, this asset was destroyed, without evidence of its value.

We will not discuss the ruling on evidence in detail further than to say that the court erroneously excluded all evidence offered by the Producers' Wood Preserving Company relative to the extension of its plant, the bridges that would be made necessary by this taking, and the occupation and use of this land north of Paddy's Run as a storage yard.

The court should have given to the jury, in lieu of instruction No. 1, this instruction, which is an adaptation of the one prepared in L. & N. R. Co. v. Burnam, 214 Ky. 736, 284 S. W. 391:

"You are instructed that the plaintiff had a right to take the strip of land described in the evidence, containing 9.3 acres for the purpose of constructing a storm water channel concerning which

you have heard testimony. You are therefore to consider the fair market value of the tract of 9.3 acres taken in relation to the entire 170 acres of which the said tract was a part, and as it was before it was known or understood that the channel was to be constructed over and through this property, taking into consideration all the purposes for which you may believe from the evidence this 170 acres was adapted.

"You are further to consider the damage, if any, to the remaining 160.7 acres, after these 9.3 acres are taken, and prudently used for the purposes taken, the shape of the pieces left, their condition, connection with and relation to each other, and the added burden, if any, of erecting and thereafter maintaining any bridges or other improvements that you may find from the evidence will, after and because of the taking be reasonably necessary to afford the defendant such reasonable use and enjoyment of its property as was had before the taking; and considering these things, you will award the defendant such a sum as you may believe from the evidence is the fair and reasonable market value of the 9.3 acres taken, and in addition, such sum as will reasonably compensate defendant for the damage, if any, done to the 160.7 acres remaining. The entire amount of your finding should not exceed the difference between the actual fair market value of the entire tract of 170 acres immediately before it was known or understood that the channel was to be constructed over and through the land of the defendant, and the fair market value of what is left immediately after the taking."

For the errors indicated, the judgment is reversed. The whole court sitting.