# Bond Bros. v. Louisville & Jefferson County Metropolitan Sewer Dist. et al.

# Louisville & Jefferson County Metropolitan Sewer Dist. et al. v. Bond Bros.

# B. F. Goodrich Co. v. Louisville & Jefferson County Metropolitan Sewer Dist. et al.

# Louisville & Jefferson County Metropolitan Sewer Dist. v. B. F. Goodrich Co.

February 6, 1948.

As corrected on denial of rehearing June 25, 1948.

690

Woodward, Dawson, Hobson & Fulton for Bond Bros.

Squire Ogden, T. M. Galphin, William H. Abell, and Ogden, Tarrant, Galphin & Street for B. F. Goodrich Co.

J. Verser Conner, Gilbert Burnett, and John R. Moreman for Louisville & Jefferson County Metropolitan Sewer Dist., and others.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The appeals of Louisville and Jefferson County Metropolitan Sewer District and the City of Louisville v. Bond Brothers and the B. F. Goodrich Company, seek to reverse judgments that no power was reposed in the appellant to establish a different rate of sewer service charges for property located outside the limits of Louisville than within. The judgments in that relation are reversed for the reasons given in the cases of the Louisville & Jefferson County Metropolitan Sewer District v. Joseph A. Seagram & Sons, et al., and the Louisville & Jefferson County Metropolitan Sewer District v. International Harvester Company, 307 Ky. 413, 211 S. W. 2d 122. These two suits sought to have it judicially declared that the plaintiffs are not liable for the payment of any sewer service charges. Both parties prosecute appeals from that part of the judgments in their cases denying such declaration and adjudging

them to be liable. The question is whether the parties for a valuable consideration are relieved from the imposition of service charges for the use of a sewer serving both industries by virtue of a judgment in which was incorporated a contract between the Commissioners of Sewerage of Louisville and Producers Wood Preserving Company, predecessor in title and right of the appellants.

I. The first question presented is the interpretation of the contract and judgment.

Prior to 1928 the Producers Wood Preserving Company owned a tract of 170 acres on the headwaters of a stream, called Paddy's Run, in Jefferson County. It used the creek for the disposal of a large volume of water utilized in the creosoting plant. In a major construction (for which purposes the Board of Sewerage Commissioners was created; see Acts of 1920, Chap. 86) it was deemed necessary to run an open drainage channel following the course of Paddy's Run through the property. In a condemnation proceeding a verdict for $49,500 was returned in favor of the company for 9.3 acres of land taken and incidental damages. The right of way was from 175 to 300 feet wide. The company was not satisfied, and on its appeal we reversed the judgment and held it to be entitled to additional compensation for having its manufacturing plant on the south side of the stream cut off from access to its property on the north side. It had pleaded $175,000 damages on this account. Producers' Wood Preserving Company v. Commissioners of Sewerage, 227 Ky. 159, 12 S. W. 2d 292.

Upon the return of the case, the parties came to an agreement by which the company should retain the amount paid under the judgment for the property taken, and acquire certain further rights. The contract was later embodied in an agreed judgment. In the judgment the Commissioners of Sewerage were granted a perpetual easement over the land to construct, use and maintain a covered concrete sewer. The Commissioners were required to "cause the existing ditch to be filled even with or above the natural surface within three years." The company was granted the right at any time it should desire to fill the valley of Paddy's Run up to the level

of the high ground, and in doing so to fill the right-of-way granted the Commissioners. It was also given the right to use the surface over the sewer. The agreed judgment further provided that the Commissioners would—

"Construct suitable openings or connections into its main sewer on either side thereof, for defendant's use in connecting its sewerage and storm water or natural drainage from the defendant's existing property.

"If the existing drainage ditch be changed so as to require the removal of, or other expense in connection with existing water mains or electric wires or bridges, the plaintiff will pay the cost thereof, it being the purpose and intent that plaintiff (Commissioners of Sewerage) shall maintain such connections and ways, or pay the cost of substituting others equally as good and serviceable."

Following the judgment, the company executed a consistent deed, embodying the above and other terms, to the Commissioners on June 11, 1929.

It is also expressly provided in the deed: "All grants herein by or to either party hereto shall be also to their successors and assigns, and all covenants entered into herein shall be for the benefit of and shall also obligate their successors and assigns, and all agreements, stipulations and covenants shall run with the land hereby granted and be for and to the successors and assigns of the parties hereto."

Bond Brothers is the corporate successor of the Producers Wood Preserving Company and the grantee in a deed (dated April 30, 1935) containing the rights given and reserved in its deed to the Board of Sewerage Commissioners. The City of Louisville, as successor to the rights and liabilities of its Board of Sewerage Commissioners, has performed the obligations of the judgment. Producers Wood Preserving Company and Bond Brothers have continuously used the facilities without charge. Goodrich acquired title by mesne conveyances from Producers Wood Preserving Company to about 54 acres of the tract on which it has operated two large manufacturing plants. It uses nearly one billion gallons of water a year and Bond Brothers also a very large quantity. Both companies get the water from their own

wells and from the Louisville Water Company. This drains into the sewer referred to in the contract and judgment, which is now maintained and operated by the Metropolitan Sewer District, although it is still owned by the City of Louisville. Since it established its plants more than fifteen years ago, Goodrich has had the unrestricted use of the sewer without charge.

The controversy between the parties as to the proper construction of the contract, the judgment and the deed arises from the provision that the sewerage commissioners would construct suitable openings or connections for the company's "use in connecting its sewerage and storm water for natural drainage from" its property. The appellants maintain that this provision gave them the "use" of the sewer. They point to the fact that the sewer ran through the middle of the tract upon which Producers' industry was located and extensions would be made, and that it was in substitution for the natural drainage of the creek; that the connections were manifestly for its use. They emphasize the provision in the second paragraph quoted that it was "the purpose and intent that plaintiff (Commissioners of Sewerage) shall maintain such connections and ways" at its expense or "pay the cost of substituting others equally as good and serviceable." They regard the word "ways" as the means of removing drainage and sewerage.

On the other side the argument of the district is that these provisions granted only the right to tap the sewer without charge. They say that "ways" refers to the existing water mains, wires and bridges on the surface across the open ditch or the trunk line sewer.

The provision is not clear prima facie. Light is shed upon the ambiguity by the assertion in brief that at the time the general practice of the city was not to make any service charges for the use of a sewer as distinguished from the charges for tapping or connecting it. It appears further that the Board of Sewerage Commissioners had no power to impose service charges. It was an agency of the City of Louisville for the accomplishment of a particular purpose, namely, the construction of large additions to the sewerage system under bond issues. It did have the power of eminent domain and the consequential power of making a compro-

·mise agreement for compensation. When construction was completed, its existence as a body corporate terminated and the City in its own name succeeded to all its assets and obligations, including the contracts it had made. See 1920 Acts, Chap. 86. It is conceded in the briefs (and appears in the records of Seagram and other cases of this series) that after the construction of these sewers the City levied charges upon other industries located without the city boundaries. The rule that in seeking what parties to a contract meant and intended, the courts will look to the circumstances surrounding them and the customs at the time applies to contracts with municipalities. Thus, in City of Versailles v. Brown, Ky., 96 S. W. 1108, where land had been conveyed to the City in consideration of its agreement to grade and macadamize a street without the width being stipulated, it was held that the customary width in such locations was intended. And in Union Light, Heat & Power Company v. Young, 146 Ky. 430, 142 S. W. 692, where only natural gas was being used when the contract was made, it ·was held that it did not mean or permit the use of mixed gas. See also Bullock v. Young, 252 Ky. 640, 67 S. W. 2d 941. Thus, we have the contemporaneous construction of the contract. We quote from City of Covington v. South Covington, & C. St. Railway Company, 147 Ky. 326, 144 S. W. 17, 19: "Lord Erskine once said: 'If you will tell me what the parties have done under a contract, I will tell you what it means.' Both parties here, for 15 years, put the same construction upon this contract, and, taking it as a whole, we cannot see how a different construction can properly be put upon it."

Considering the fact that when the city afterward adopted the policy and practice of charging other industries similarly situated it passed by the successors to the Producers Wood Preserving Company and exacted no charges of them, it must have regarded the judgment in the condemnation·suit as forbidding it. This was a reasonable construction. The company had not been satisfied with the compensation it had received in the condemnation suit. On appeal it had been successful in its claims to a right of greater compensation for damage to the tract as a whole. It would not with any degree of reasonableness have surrendered this valuable

adjudicated right for the small cost of constructing openings or a temporary right of tapping the sewer. And, furthermore, if that were all, it would have lost the use of its natural drainage without any substitute for it had no legal right to use the sewer, and in any event it would have been placed at the mercy of the city in the exaction of charges without limit for the use. Obviously, mere connection without use would be a futility and mean absolutely nothing. Though not specific as in the Strathmoor Cases (Louisville & Jefferson County Metropolitan Sewer District v. Strathmoor) 307 Ky. 343, 211 S. W. 2d 127, the purpose of the contract, the resulting judgment and the reservation in the deed was use. The reservation of use was all that the company was getting. The consideration in the St. Matthews Sanitary Association contract was the equivalent of a contribution to the cost of the facility and it was made to protect the health of inhabitants of the area and of the city.

We, therefore, construe the judgment and deed to have granted Producers, for a valuable consideration, the use of this sewer, and that such right and use passed to its successors in title to the land for similar industrial purposes.

II. The Metropolitan District and City of Louisville claim the right and authority to abrogate the contract and judgment under the police power. The argument rests upon the proposition that the construction we have given the contract has the effect of bartering away the city's police power and it is undisputed that cannot be done. By contract and judgment of the court the appellees acquired a valuable property right, namely, the use of the sewer in consideration of the surrender of another adjudicated property right, i. e., to compensation for damages to the property suffered in behalf of the public. The appellees maintain that police power cannot be used as a means of taking property without compensation or to impair the obligations of a contract, except perhaps in a case of emergency.

As we have observed in the St. Matthews Sanitary Association opinion delivered today, Louisville & Jefferson County Metropolitan Sewer District v. St. Matthews Sanitary Ass'n, 307 Ky. 348, 208 S. W. 2d 490,

.the construction of sewers and drains is a certain object of the police power. To accomplish that objective the full force of the power may be applied, and that may require that property rights be subordinated even though they are otherwise within the protection of the Constitution. In doing so we do not doubt that the cost may be met by special assessment upon property benefited or by requiring payment for the use of the facility. And, further, that such usage or service charge may be imposed for the operation and maintenance of the facility when it is contemporaneously implemented as an incident of the plan and program for the abatement or prevention of a nuisance. 17 Am. Jur., Drains and Sewers, Secs. 60, 66. If the menace has been removed, public necessity and general welfare have been met and served and the object has been accomplished. The question is whether the police power may be asserted years afterward to destroy property rights or to abrogate a contract made by the same unit of government in order to raise revenue to operate and maintain the facilities.

Whether the authority to "collect sewer rates, rentals, and other charges, for service rendered by the facilities of the district" (KRS 76.080(10) in the ordinary case comes from the police power or from the right of the city to require payment for the use of its facilities is not a material question. In such a case there is no clash with rights protected from seizure or impairment by the Constitution. We are here dealing with supremacy in such a conflict. The touchstone is necessity and reasonable relationship. It is fundamental that such as extraordinary power is not without limitation, for it may not operate unreasonably beyond the occasion or necessity of the case. It may not unreasonably invade private rights and thus violate those rights guaranteed under either the Federal or the State Constitution. 11 Am. Jur., Constitutional Law, Sec. 259. The exercise of the power must have a substantial basis and cannot be made a mere pretext for actions that do not come within its scope. To state it another way, the action of the government may not arbitrarily invade liberty or property rights under the guise of police regulation. Beacon Liquors v. Martin, 279 Ky. 468, 131 S. W. 2d 446; City of Louisville v. Kuhn, 284 Ky. 684, 145 S. W. 2d 851.

It has been said that the law of nuisances ordinarily furnishes help in ascertaining the scope of the power. Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R., 1016. But a legislative body, or any other, attempting to exercise the power under delegation, cannot declare something a nuisance when in fact it is not, nor "under the guise of its police power may act arbitrarily and unreasonably without a rational relation to the protection of the common welfare." City of Mt. Sterling v. Donaldson Baking Company, 287 Ky. 781, 155 S. W. 2d 237, 239.

If the representatives of the city made a bad bargain, as subsequent events have developed, we see no more authority for relieving the city and its agency of that bargain without compensation than there was for the taking of the right of way over the land in the first place without compensation because the public very much wants the relief now just as it wanted relief then. Our Bill of Rights recognizes as inalienable "the right of acquiring and protecting property" and declares that the property of no citizen shall be taken "or applied to public use without the consent of his representatives, and without just compensation being previously made to him." Kentucky Constitution, Secs. 1 and 13. Justice Holmes, writing for the court in reference to the apparent conflict between police power and the provisions in the Constitution prohibiting the taking of private property without due process of law or compensation, said in Pennsylvania Coal Company v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 160, 67 L. Ed. 322, 28 A. L. R. 1321:

"When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go—and if they go beyond the general rule, whether they do not stand as

much upon tradition as upon principle. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said this is a question of degree—and therefore cannot be disposed of by general propositions. But we regard this as going beyond any of the cases decided by this Court.''

In that case the court held that a statute prohibiting the mining of coal under private dwellings or streets or cities in places where the right to mine such coal was reserved in the grant was unconstitutional as taking property without due process of law. Years before there had been a severance of title to the minerals from the surface of what became a part of the city of Scranton. The case is generally regarded as an extreme one, but it vividly illustrates the superiority of constitutional rights even where the demand for the protection of the public is very great. In the case at bar the public demand or necessity is far from being great. There is in fact no imperious demand requiring the use of the police power to take property without compensation or destroy a contract or nullify a judgment. The strength of every contract lies in the right of the parties to rely upon the constitutional security against legislative impairment of its obligations.

We have an analogue in City of Louisville v. Wible & Willinger, 84 Ky. 290, 1 S. W. 605, 606, 8 Ky. Law Rep. 361. The city had made a contract with Wible & Willinger to remove from the streets and other public places the carcasses of animals free of cost. Before its expiration the city, in disregard of their rights, proposed to sell the same privilege to the highest bidder. To sustain its action the city claimed that as removal and disposal of dead animals ''is one of the police powers of the city necessary to be exercised at all times to preserve the health, comfort, and cleanliness of the city, she has no legal power to limit or surrender its control, by contract, over that subject, or kindred ones, beyond her recall at pleasure.''

After commenting upon the principle that the sovereign may not surrender its police power, the court

stated that the city had not done so by the contract but had exercised it "in an efficient and prudent manner" for a sufficient consideration; that it had then "without just cause, or any cause, of complaint capriciously tired of its contract, and proposed to break it." The court observed that if the firm had breached its contract or it had become necessary for the city to establish new regulations or withdraw the contract altogether in order to prevent a nuisance arising it might do so under the police power. "But to allow the city to disregard or recall its contract with its contractors, or employes engaged to service by fixed terms, upon its mere caprice, or to gain a pecuniary advantage, would be the exercise of an arbitrary power that does not exist in the land."

In the present case there is not only a contract but a judgment. We perceive no authority in the city, a party to that case, or the Metropolitan District, its operating agency, to nullify the judgment and cancel a fixed and adjudicated right of a successful litigant. Hodges v. Snyder, 261 U. S. 600, 43 S. Ct. 435, 67 L. Ed. 819. In Mooney v. Drainage District No. 1, 134 Neb. 192, 278 N. W. 368, a land owner had paid an assessment by a drainage district for drainage which proved insufficient, and had obtained a judicial decree that the outlet be enlarged. Later a statute was enacted withdrawing or denying power in the drainage districts to make expenditures for additional outlets. Upon its reasoning and the authority of Black on Judgments, (2d Ed.) Section 298, and Cooley on Constitutional Limitations (8th Ed.) Sec. 190, the court held the property right acquired under the judgment was beyond legislative invasion.

The police power cannot be used to raise revenue unless it be an incident in the accomplishment of a proper end of promoting order, safety, health, morals or general welfare, to which end the fees have a reasonable relation. The object must always be regulation. 16 C. J. S., Constitutional Law, sec. 174; Great Atlantic & Pacific Tea Company v. Kentucky Tax Commission, 278 Ky. 367, 128 S. W. 2d 581; Reeves v. Adam Hat Stores, 303 Ky. 633, 198 S. W. 2d 789.

The appellees rely upon the cases holding that private contracts under which free passes were issued by common carriers, or free or lower rates for public

utility service were agreed to, are subject to change by legislative action. See Louisville & N. R. Company v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A., N. S., 671, reversing 133 Ky. 652, 118 S. W. 982; Kentucky Traction & Terminal Company v. Murray, 176 Ky. 593, 195 S. W. 1119. It is generally regarded that such contracts are entered into subject to the reserved authority in the State to modify them in the interest of the public welfare, and that rate regulations do not unconstitutionally impair existing contracts between public service corporations and consumers. Annotations 9 A. L. R. 1423; 11 A. L. R. 460; 41 A. L. R. 257. But the judicial rulings of nullification indicate, where they do not definitely say, that the party suffering loss had the remedy of recovering compensation therefor. See Louisville & N. R. Co. v. Crowe, 156 Ky. 27, 160 S. W. 759, 49 L. R. A., N. S., 848; Annotation, 14 A. L. R. 252.

A case like the present one is Schiller Piano Company v. Illinois Northern Utilities Company, 288 Ill. 580, 123 N. E. 631, 11 A. L. R. 454. The Piano Company owned a river dam from which it obtained power for its factory. The dam was capable of creating much greater power. The company made a contract by which it sold and transferred to a power company the power it was getting from the dam in consideration that it be perpetually furnished a certain measure of electricity without charge. In the course of time a utilities company, successor to the power company, terminated the contract. Justification was that a later enacted statute which prohibited a public utility from furnishing service at less than an approved schedule of rates rendered the contract unlawful. The court held that the statute did not apply because it would be an unlawful invasion and impairment of private rights guaranteed by the state and federal constitutions. The decision has been criticized and said to be against the weight of authority. But in Commonwealth ex rel. Page Mill Company v. Shenandoah River Light & Power Corporation, 135 Va. 47, 115 S. W. 695, (see note, 41 A. L. R., 258) a distinction was found between the Schiller case and others in that an interest in the dam itself was conveyed by the consumer to the utility company as a consideration for the furnishing of electricity, whereas in other cases

there was no conveyance of the producing instrumentality. That distinction seems to be present in the case now before us. The appellants' predecessor reserved or retained a right which it had, viz., to use the same channel for drainage purposes. Of like character is Allen v. Railroad Commission, 179 Cal. 68, 175 P. 466, 8 A. L. R. 249. But whether so or not, we are of opinion that the distinction between the authorities relied upon and this case is that in them the government had stepped in to abrogate a contract between a utility company or common carrier and an individual or company in order to prevent discrimination. The regulation of rates for public service is itself the exercise of the police power aimed and directed straight at conditions deemed inimical to public welfare, hence is clearly within its scope as is universally recognized.

Another line of authority upon which the appellees rely is that which recognizes that the right to exercise the power is a continuing one, and though once used toward relieving a particular condition it may be used again upon the same condition when it becomes necessary. Typical is Chicago, B. & O. R. Co. v. Nebraska, 170 U. S. 57, 18 S. Ct. 513, 519, 42 L. Ed. 948. A city entered into a contract with a railroad company for the construction of a viaduct at their joint expense, and it was agreed that there "should be a common obligation to keep it in repair." A later legislative act was held valid which required the railroad to keep the viaduct in repair at its own expense. In affirming a judgment of the Supreme Court of Nebraska, the Supreme Court of the United States said: "We think that, in view of the paramount duty of the legislature to secure the safety of the community at an important crossing within a populous city, it was and is within its power to supervise, control, and change such agreements as may be, from time to time, entered into between the city and the railroad company in respect to such crossing, saving any rights previously vested."

Like cases are Northern Pacific R. Co. v. Minnesota, 208 U. S. 583, 28 S. Ct. 341, 52 L. Ed. 630; New Orleans Gaslight Co. v. Drainage Commission, 197 U. S. 453, 25 S. Ct. 471, 49 L. Ed. 831; Missouri, K. & T. R. Co. v. Oklahoma, 271 U. S. 303, 46 S. Ct. 517, 70 L. Ed. 957. And in Milner v. Gibson, 249 Ky. 594, 61

S. W. 2d 273, we held that contracts between banks and depositors are subject to the sovereign power of the government to enact legislation for the protection of the public welfare, and where its protection demands, private contracts must yield. The distinction in this line of cases is like that suggested in referring to the regulation of public service rates — the exercise of police power strikes a condition that is deemed detrimental or operates as a reasonable necessity for the public good. The rule would have been applicable, for instance, had the drainage ditch remained open and twenty years later it had become a peril and it then became necessary to change it or run a closed sewer along the right of way.

Without extending the opinion further—perhaps now beyond due bounds—we hold that the appellants' contract cannot be abrogated or their vested rights destroyed by imposing the sewer service charges promulgated by the Metropolitan District without due compensation being made.

The judgments are, therefore, reversed for consistent proceedings.