**PINNACLE DEVELOPMENT II, LLC,**
Appellant/Cross–Appellee

v.

**RML CONSTRUCTION, LLP,**
Appellee/Cross–Appellant.

Nos. 2012–CA–000826–MR,
2012–CA–000894–MR.

Court of Appeals of Kentucky.

Aug. 30, 2013.

Nick Wallingford, Lexington, KY, for Appellant/Cross–Appellee.

William M. Lear, Jr., Rena Wiseman, Lexington, KY, for Appellee/Cross–Appellant.

Before ACREE, Chief Judge, CLAYTON and MOORE, Judges.

*OPINION*

MOORE, Judge:

Pinnacle Development II, LLC (Pinnacle) appeals a judgment of the Fayette Circuit Court awarding it $5,049.29, rather than its prayed-for amount of $48,946.59, in its breach of contract action against RML Construction, LLP (RML). RML cross-appeals arguing that the circuit court erred in failing to dismiss Pinnacle's action as time-barred. Upon review, we agree that Pinnacle's action was indeed time-barred and we reverse the circuit court's decision to the contrary.

## FACTUAL AND PROCEDURAL HISTORY

On March 20, 2007, the Lexington–Fayette Urban County Government promulgated Ordinance No. 41–97, entitled

AN ORDINANCE ESTABLISHING AND ADOPTING A PRIVILEGE FEE FOR CONNECTION TO AND USE OF THE SEWER FACILITIES SERVING BENEFITED PROPERTIES IN THE WEST HICKMAN NO. 1 OUTER PERIMETER SEWER PROJECT AREA; AND AUTHORIZING AND DIRECTING THE MAYOR, ON BEHALF OF THE URBAN COUNTY GOVERNMENT, TO EXECUTE THE WEST HICKMAN NO. 1 PRIVILEGE FEE AGREEMENT.

This ordinance touches upon the history of this case and provides a measure of context. In relevant part, it provides:

WHEREAS, the Government owns and operates a system of sanitary sewer collection and treatment for the benefit of its citizens and taxpayers; and

WHEREAS, the sanitary sewer trunk line identified as the West Hickman No. 1 Project is recommended for construction in the implementation plan for construction of the Outer Perimeter Sewer Systems–1986; and

WHEREAS, the West Hickman No. 1 Project facilities will facilitate development, serve existing developed properties, and enhance environmental conditions in the water shed area; and

WHEREAS, owners of property to be ultimately benefited by the West Hickman No. 1 facilities have been provided written notice, by certified mail, of a description of the proposed project and the shares of costs to be borne by each property along with notice of an opportunity to attend an informational meeting concerning the project and notice of an opportunity to be heard concerning the project at a special meeting of the Urban County Council held on February 25, 1997; and

WHEREAS, it is in the best interests of the Government and the owners of benefited property, their heirs, successors and assigns, that they be ultimately responsible for a pro rata portion of the cost of constructing facilities as hereinafter provided, calculated and based on the acreage of their property and the cost of providing sewer availability for such property, with reimbursement payments being due and owing only at such

time as development occurs on such property; and

WHEREAS, benefited property owners, their heirs, successors and assigns should not be required to pay a pro rata share of the project cost until such time as their property is developed;

NOW, THEREFORE, BE IT ORDAINED BY THE COUNCIL OF THE LEXINGTON–FAYETTE URBAN COUNTY GOVERNMENT:

Section 1—That in consideration of the foregoing premises and pursuant to Code of Ordinances Section 16–62 and other powers and authorities of this Government, a privilege fee for benefited properties connecting to and using the facilities of the West Hickman No. 1 Outer Perimeter Sewage System be and hereby is established and adopted.

Section 2—That the terms, cost allocations and conditions of the privilege fee are adopted and enacted pursuant to Code of Ordinances Section 16–62 and as set forth in the privilege fee agreement which is attached hereto and incorporated herein by reference.

Section 3—That the Mayor, on behalf of the Lexington–Fayette Urban County Government, be and hereby is authorized and directed to execute the West Hickman No. 1 privilege fee agreement which shall be recorded in the Office of the Fayette County Clerk.

Contemporaneously with the passage of Ordinance No. 41–97, the "privilege fee agreement" referenced in Section 3 (which regarded the construction of the "West Hickman No. 1 Project," a sanitary sewer trunk line located near Tates Creek Road in Lexington) was executed between Pinnacle[1] and LFUCG. The agreement

states that the trunk line in question would benefit 322.1 acres of undeveloped property in that area consisting of 66.8 acres owned by William S. Dale, 24.3 acres owned by the Mahan Family Limited Partnership, 40.4 acres owned by Ball Homes, Inc., and 190.6 acres owned by Pinnacle. As indicated in Ordinance No. 41–97, the agreement stipulates that the cost of installing the trunk line would ultimately be apportioned among these separate owners commensurate with the acreages of their respective properties. The agreement also stipulates that Pinnacle would pay the entire cost of installing the trunk line up front; that Pinnacle "shall be reimbursed consistent with the provisions of this Agreement by the collection of a Privilege Fee by the Government from the Non–Participating Owners, their heirs, successors and assigns"; and that "the Trunk Line, when completed by [Pinnacle] and accepted by the Government, shall be dedicated to the Government."

The Mahan Family Limited Partnership transferred its ownership of the 24.3 acres described in the privilege fee agreement to RML on March 3, 2000, shortly after construction of the West Hickman 1 trunk line had been completed. It is undisputed that if RML became liable for paying the total balance of the privilege fees attributable to that acreage, RML became liable for paying it no later than November 27, 2002, when it completed "developing" all of the Mahan Family Limited Partnership property within the meaning of the privilege fee agreement. It is also undisputed that LFUCG collected privilege fees from RML prior to that date in the amount of $15,661.50, and that Pinnacle received that amount from LFUCG.

---

1. TCF 2, LLC, executed this agreement with LFUCG. TCF 2, LLC, was Pinnacle's predecessor in interest under the contract. For the sake of simplicity, we refer to both entities as "Pinnacle."

However, in 2009, LFUCG came to believe that the $15,661.50 that it had collected from RML only represented privilege fees attributable to 7.57 of the 24.3 acres RML had received from the Mahan Family Limited Partnership, and that RML had an outstanding obligation to pay additional privilege fees in the amount of $48,946.59 attributable to the remaining 16.73 acres RML had developed in 2002. LFUCG made a demand of RML to pay this amount, but RML refused to do so. Thereafter, Pinnacle filed an action against RML, asserting that it was the real party in interest of an enforceable contract; that RML was a party to that contract; that RML was contractually obligated to pay Pinnacle privilege fees pursuant to that contract; and that RML had failed to pay it the full measure of its privilege fees, and was therefore in breach.

During the ensuing circuit court proceedings, one of the several issues raised in this matter was how to characterize RML's obligation to pay privilege fees. RML asserted that if it was liable for paying any amount of privilege fees, it was a liability that LFUCG had placed upon it through the exercise of statutory authority; that it was a liability that had matured in 2002; and, that Pinnacle's suit to collect any outstanding part of that liability, which Pinnacle filed in 2010, was therefore barred by the five-year period of limitations specified in Kentucky Revised Statute (KRS) 413.120(2). Accordingly, RML moved to dismiss Pinnacle's action. In resolving this issue by way of an interlocutory order, however, the circuit court determined that RML was contractually obligated to pay privilege fees directly to Pinnacle, and that Pinnacle's action

against RML was therefore timely because it had been filed within the 15–year period of limitations relating to written contracts as specified in KRS 413.090(2).

Pinnacle has filed its appeal in this matter because the circuit court later determined in its final order that the total amount of RML's outstanding privilege fees was $5,049.29, rather than the $48,946.59. RML, on the other hand, has cross-appealed the circuit court's conclusion that RML's obligation to pay privilege fees was a contractual obligation rather than a statutory one, and its consequent decision to overrule RML's motion to dismiss Pinnacle's suit as untimely.

## ANALYSIS

■ Because it is dispositive of this matter, we need only address RML's argument in its cross-appeal that the previously-discussed privilege fees are at best a statutory obligation, that the statute of limitations specified in KRS 413.120(2) therefore barred Pinnacle's suit, and that the circuit court erred by failing to dismiss Pinnacle's suit on that basis. This is an issue of legal interpretation and there are no material facts in dispute; therefore, we review the circuit court's application of the law *de novo*. *Western Kentucky Coca–Cola Bottling Co., Inc. v. Revenue Cabinet*, 80 S.W.3d 787, 790 (Ky.App.2001)

■ According to the terms of the privilege fee agreement itself, the "privilege fee" at issue in this matter did not represent a rental charge or payment for services rendered, nor was liability for paying it conditioned upon any use of the trunk line in question.[2] Rather, the privilege fee

---

**2.** The privilege fee agreement generally provides that each non-participating owner's privilege fee may be prepaid, but is due "at such time as development occurs with respect to their property." According to paragraph

8, this means that the privilege fee shall be due immediately prior to the signing of a final subdivision plan by the Urban County Engineer or his designee. In the event that a final subdivision plan is not required, the payment

specified in the agreement resembled what is generally regarded as a special assessment to pay for a local improvement, or, stated differently, a "local burden[ ] laid on property made for a public purpose, but fixed in amount once and for all time with reference to the special benefit which such property derives from the cost of the project[.]" *Krumpelman v. Louisville & Jefferson County Metropolitan Sewer Dist.*, 314 S.W.2d 557, 561 (Ky.1958); *see also Conrad v. Lexington–Fayette Urban County Government*, 659 S.W.2d 190, 196 (Ky.1983) (special assessment for public sewer improvements is "an assessment which is to be made in an amount with reference to the benefit which the property derives from the cost of the project").

Like a special assessment, for example, the privilege fees were meant to burden specific property. The privilege fee agreement only purported to hold William S. Dale, the Mahan Family Limited Partnership, and Ball homes liable for paying privilege fees by virtue of their ownership of their respective acreages; the fee agreement itself was recorded at the Fayette County Clerk's office as an encumbrance against their previously mentioned acreages; and, LFUCG generally regards the recordation of a privilege fee agreement such as the one at bar (*i.e.*, one executed pursuant to pursuant to Section 16–62 of the LFUCG Code of Ordinances) as a viable encumbrance against specific real property.[3] *See, e.g.*, Kentucky Attorney General Opinion (Ky.OAG) 09–001.

■ Like a special assessment, the privilege fees described in the agreement were

also directed toward funding a public purpose, namely, the installation of a sanitary sewer trunk line and its dedication to LFUCG. As a general matter, building and maintenance of public sewers is a "governmental function" and one of the most certain objects for exercise of police power. *Louisville & Jefferson County Metropolitan Sewer Dist. v. Town of Strathmoor Village*, 307 Ky. 343, 211 S.W.2d 127 (1948); *see also Bond Bros. v. Louisville & Jefferson County Metropolitan Sewer Dist.*, 307 Ky. 689, 211 S.W.2d 867, 871 (1948).

Like a special assessment, the privilege fees described in the agreement were also fixed in amount once and for all time with reference to the special benefit which the property derived from the cost of the project. To that end, Paragraph 7 of the agreement provided a formula for calculating each non-participating owner's total privilege fee by dividing the net construction costs of the project by the total acreage described in the agreement, multiplying the result by the non-participating owner's amount of acreage, and adding interest for each year the amount remained unpaid.

■ The most compelling similarity between a special assessment and the privilege fees described in the agreement, however, involves the term "non-participating owners." As noted, the agreement assigns this term to William S. Dale, the Mahan Family Limited Partnership, and Ball Homes, Inc. And, as a plain reading of the term would indicate, William S. Dale, the Mahan Family Limited Partnership, and

---

of the fee shall be due prior to the approval of the sanitary sewer plans by the Division of Engineering. . . .

**3.** One of the several arguments RML asserts in its cross-appeal is that if the recordation of the privilege fee agreement does qualify as an encumbrance against property, the agree-

ment's description of its property is vague and any attempted encumbrance against its property is therefore void. We need not address this argument because our resolution of this matter based upon the statute of limitations has rendered this argument entirely moot.

Ball Homes, Inc., did not participate in executing the privilege fee agreement or assent to it. It therefore follows that their liability for paying the privilege fees specified in the agreement was not the product of any contract of their own making. *See, e.g., Conners v. Eble,* 269 S.W.2d 716, 717–18 (Ky.1954) ("To create a valid, enforceable contract, there must be a voluntary, complete assent by the parties having capacity to contract"). It more closely resembles an enforced contribution on a property owner for the public benefit, which is the hallmark of a special assessment levied by a local government in the exercise of its taxing powers.[4] *Krumpelman,* 314 S.W.2d at 561. Indeed, the fact that the agreement itself authorized only LFUCG to collect the privilege fees from the non-participating owners, and gave no such authority to Pinnacle, further supports that the privilege fees represent an exercise of LFUCG's taxing powers.[5]

■ To be clear, there is no common-law liability on the part of an abutting property owner to pay for a public improvement; such liability can only be imposed by statute, and it is a liability created only when the manner prescribed for the accomplishment of the improvement is strictly pursued. *City of Owensboro v. Hope,* 33 Ky.L.Rptr. 426, 110 S.W. 272, 274 (1908); *see also City of Middlesboro v. Terrell,* 259 Ky. 47, 81 S.W.2d 865, 866 (1934) (liability of a property owner for

paying special improvement assessments is entirely statutory); *City of Louisa v. Horton,* 263 Ky. 739, 93 S.W.2d 620, 624 (1935) (same). Therefore, an action to collect the amount of an assessment charged by a local government against certain property to fund improvements must, in the absence of any other period of time specified by statute, be commenced within five years after the cause of action first accrued. *Terrell,* 81 S.W.2d at 866 (holding city's right to assess property with the cost of street improvements and suit to collect the assessment is governed by 5–year statute of limitation specified in Kentucky Statute (Ky.St.) § 2515, the predecessor statute of KRS 413.120(2)); *Horton,* 263 Ky. 739, 93 S.W.2d 620 (same); *City of Mayfield v. Carey–Reed Co.,* 260 Ky. 43, 83 S.W.2d 891, 893 (1935); *Board of Drainage Com'rs of McLean County v. Igleheart,* 301 Ky. 596, 192 S.W.2d 364 (1946) (holding five-year statute of limitation, rather than 15–year statute of limitation, applied to action to enforce statutory lien for amounts assessed by county against land for construction of drainage district).

With that said, most of the support Pinnacle presents in favor of its argument that the privilege fees qualify as a contractual expectancy, rather than a special assessment, is a portion of Section 16–62.1 of the LFUCG Code of Ordinances. In its entirety, the ordinance in question provides:

(Internal citation omitted.)

---

**4.** As further explained in *Board of Drainage Com'rs of McCracken County v. Graves County,* 209 Ky. 193, 272 S.W. 387 (1925),

[A]lthough beneficial assessments levied against specific property are imposed by an exercise of the sovereign power and are in a sense a tax, they nevertheless are not taxes within the meaning of the constitutional and statutory limitations upon the power to tax.... Hence while taxes and assessments are not the same and are easily distinguished, they are but different forms of the exercise of the sovereign power[.]

**5.** In addition to stating no fewer than four times that the privilege fee was to be collected only by LFUCG, the agreement also contains the following provision:

*10. Release of Government:* The owner agrees to hold the Government harmless from any liability arising from the failure to collect privilege fee amounts due under the agreement.

Sec. 16–62.1. Privilege fees; alternate method.

(a) The urban county government may be compensated in the form of a privilege fee where it expends funds on construction of sewer facilities which ultimately will benefit undeveloped properties served by the sewer system in the watershed wherein such facilities are constructed.

(b) The urban county government shall provide for compensation for expenditure of funds for sewer facilities as follows:

(1) The urban county council shall determine that it is in the best interest of the government, in order to facilitate development and/or serve existing property, to expend funds on sewer facilities which will benefit properties in the watershed.

(2) A privilege fee agreement shall be prepared to be executed by the property owners who have participated in the planning and implementation of the construction plan for sewer facilities ("participating owners") *and by the mayor, on behalf of the urban county government and on behalf of property owners who have not participated in the construction plans ("nonparticipating owners").*

(3) Prior to final approval by the urban county council, the urban county government shall provide written notice by certified mail to all owners of property to be ultimately benefitted at least fourteen (14) days in advance of the work session date at which the privilege fee agreement is to be discussed, said written notice to provide a description of the proposed project, the share of costs to be borne by each property and the date of the work session at which the agreement is to be discussed.

(c) The shared costs for the construction of the sewer facilities subject to apportionment pursuant to the privilege fee agreement provided for herein shall be based upon all costs of construction, including engineering costs, easement acquisitions and right-of-way costs. (Participating owners will dedicate easements free of charge.)

(d) The shared costs shall be assessed against each property in the project area based upon acreage or density of proposed land use or both, and the privilege fee agreement shall include the exact percentage of shared costs each property shall be assessed.

(e) The privilege fee agreement shall provide that payments shall be due immediately prior to the signing of a final subdivision plan by the urban county engineer or his designee. In the event that a final subdivision plan is not required, the payment of the fee shall be due prior to the approval of the sanitary sewer plans by the division of engineering. The predetermined privilege fee due will be proportionate to the area in the subdivision plan, or the area for which approval is granted for a sanitary sewer system, if the total property subject to the privilege fee is not included.

(f) The privilege fee agreement may, in the discretion of the urban county council, provide that payments as indicated in the agreement shall bear interest at a reasonable rate from the date the sewer facilities are completed and accepted as a part of the urban county government sewer system until the payment is made.

Essentially, Pinnacle's argument is that this ordinance gives LFUCG the authority to bind a non-assenting party (*i.e.,* a "nonparticipating owner") to a contract with a private individual, and that LFUCG used that authority to bind RML to a contract with Pinnacle. Pinnacle's argument de-

pends upon the language we have italicized in section (b)(2) of this ordinance.

■ Irrespective of the language used, however, labeling an assessment a "contract" does not convert an assessment into a contract. Nor, for that matter, does it appear that Ordinance No. 16–62.1 is anything other than simply the procedure that LFUCG must follow in order to exercise its statutory authority to impose an assessment.

In any event, while an urban-county government such as LFUCG has the statutory authority to require owners of benefitted property to pay for local improvements such as the one at bar through special assessments (*see* KRS 67A.871 *et seq.*), no statute provides it with the parallel authority to bind a non-assenting party to a contract with a private individual to achieve that same end. Therefore, even if LFUCG did intend for Ordinance No. 16–62.1 to mean exactly what Pinnacle has interpreted it to mean, this ordinance is nevertheless incapable of supplying LFUCG with that authority. *See, e.g., George v. City of Raceland*, 279 Ky. 316, 130 S.W.2d 825, 826 (1939) (holding that a local government "possesses only such powers as the state through its legislature has expressly or impliedly conferred upon it").

The remaining support that Pinnacle has presented in favor of its argument consists of two cases which we will briefly address, *i.e., Hunt v. City of Ashland*, 274 Ky. 567, 119 S.W.2d 640 (1938), and *City of Ashland v. Brown's Adm'x*, 290 Ky. 740, 162 S.W.2d 552 (1942). These cases are distinguishable from the case at bar because they only concern actions against a city for the city's violation of a written obligation to collect assessments and to apply them to the payment of improvement bonds. While both of these cases assign a 15–year statute of limitation to such an action, neither resolved any kind of action against a property owner on a matured assessment.[6] And, the distinction between these two types of actions was touched upon in *City of Corbin v. Becker*, 297 Ky. 485, 180 S.W.2d 419, 420 (1944):

> Principal reliance is placed on *City of Middlesboro v. Terrell*, 259 Ky. 47, 81 S.W.2d 865, in which we held that an action on an installment of an assessment in default must be brought within five years and thirty days after the maturity of the installment.[7] But the present action is not of that character. It is not an action against a property owner on a matured assessment but one against the city for violation of its written obligation to collect the assessments and apply them to the payment of the bonds. Nor is the action merely one on a liability created by statute. It is an action on the written promise and agreement of the city, as evidenced by the bonds, to apply the sums collected by it

---

**6.** Incidentally, however, *Brown's Adm'x*, 162 S.W.2d at 553 serves to undermine Pinnacle's position. There, the Court noted that one of the reasons underpinning the action against the City of Ashland was:

> On March 9, 1934, an amended petition was filed alleging the Company did the work under the contract and that an assessment was made against a lot owned by Watt M. Pritchard for $496.92 and against a lot of the Justice Land Company for $695.32, and these two assessments aggregating $1,192.24 were in default *and had been for*

> *more than five years and were barred by the statute of limitations; that the City had negligently failed to enforce collection against these pieces of property,* resulting in the sum of $1,192.24 being lost to the paving fund and to the Company.

(Emphasis added.)

**7.** As indicated previously, *Terrell* relied upon Ky. St. 2515, the predecessor statute of KRS 413.120(2), in concluding that the 5–year limitation period was applicable.

from the assessments to the payment of the bonds. To such an action the fifteen-year limitation provided by K.S. 2514, now K.R.S. 413.090, as to actions upon a written contract is applicable. The trial court correctly held that the five-year statute of limitation did not apply.

To summarize, Pinnacle's action against RML is, from all appearances, an action against a property owner to collect an assessment qualifying as a statutory liability. Nothing in KRS 67A.871 *et seq.*, or any other statute directly applying to this matter, specifies a limitation period for such an action greater than the five-year period described in KRS 413.120(2). Pinnacle's action against RML accrued in 2002. No attempt was made to enforce RML's liability until 2010. Accordingly, Pinnacle's suit, filed after the five-year limitations period specified in KRS 413.120(2) had expired, was time-barred.

### CONCLUSION

As it relates to RML's cross-appeal, the Fayette Circuit Court erred in overruling RML's motion to dismiss Pinnacle's action on the basis of the statute of limitations. For this reason, we REVERSE and direct the circuit court to dismiss Pinnacle's cause of action. In light of our decision regarding RML's cross-appeal, we therefore DISMISS Pinnacle's separate appeal as MOOT.

ALL CONCUR.