Dewayne C. KIRK, Plaintiff–Appellant,

v.

The DENVER PUBLISHING COM-
PANY, a Colorado corporation,
Defendant–Appellee.

No. 88SA405.

Supreme Court of Colorado,
En Banc.

Sept. 23, 1991.

13. *See supra* note 6.

Pryor, Carney and Johnson, P.C., W. Randolph Barnhart, Arlene V. Dykstra, Thomas L. Roberts, Richard V. Hess, Englewood, for plaintiff-appellant.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Dianne Eret, First Asst. Atty. Gen., Denver, for amicus curiae State of Colo.

Justice QUINN delivered the Opinion of the Court.

This case involves a challenge to the constitutionality of section 13–21–102(4), 6A C.R.S. (1987), which was enacted in 1986 as part of tort-reform legislation and requires a party receiving an exemplary damages award to pay one-third of all such "damages collected ... into the state general fund." [1] DeWayne C. Kirk filed a tort claim against Denver Publishing Company,

---

1. Appellate jurisdiction over this appeal lies in this court because the constitutionality of a statute is challenged. § 13–4–102(1)(b), 6A C.R.S. (1987).

doing business as The Rocky Mountain News, and was awarded a judgment for exemplary damages in the amount of $118,980. In a post-trial motion Kirk unsuccessfully challenged the constitutionality of the one-third payment requirement and thereafter filed this appeal. We conclude that section 13–21–102(4) effectuates a forced taking of the judgment creditor's property interest in the judgment and does so in a manner and to a degree unrelated to any constitutionally permissible governmental interest served by the taking and, therefore, violates the federal and state constitutional proscriptions against the taking of private property without just compensation. U.S. Const. amends. V & XIV; Colo. Const. art. II, § 15. We accordingly reverse that part of the judgment upholding the constitutionality of section 13–21–102(4), and we remand the case to the district court with directions to conform its judgment to the views herein expressed.

## I.

Although this case has a lengthy procedural history, the basic facts can be briefly stated. Kirk, who owned and operated an independent newspaper distributorship, purchased newspapers from The Rocky Mountain News and resold them to newspaper carriers, stores, and to the public through newspaper racks. In November 1979, Kirk terminated his relationship with Denver Publishing Company, but withheld payment for part of his September and all of his October billings in order to achieve leverage in his final accounting with Denver Publishing Company.

Because Kirk and the company were unable to settle a final accounting, Denver Publishing Company sued Kirk for the balance allegedly owed by him. Kirk counterclaimed for outrageous conduct and willful and wanton breach of contract. In the first trial, the court granted Kirk's motion for a directed verdict on Denver Publishing

Company's claim for monies due on open account, directed a verdict against Kirk on his counterclaim for outrageous conduct, and entered a judgment of $910.26 for Kirk on the jury's verdict returned in his favor on his claim for willful and wanton breach of contract. The court of appeals affirmed the trial court's directed verdicts on Denver Publishing Company's open account claim and Kirk's counterclaim for outrageous conduct, and also affirmed the judgment of liability on Kirk's counterclaim against Denver Publishing Company for willful and wanton breach of contract, but remanded the case for a new trial "on the issues of actual damages, damages for emotional distress, and exemplary damages" on Kirk's contractual claim. *Denver Publishing Co. v. Kirk*, 729 P.2d 1004, 1009 (Colo.App. 1986).

Upon remand of the case for a new trial, Kirk was realigned as the plaintiff and was permitted to add a claim for malicious prosecution. The case was retried in 1988, and the jury awarded Kirk compensatory damages in the aggregate amount of $288,000 and exemplary damages in the amount of $160,500 on Kirk's claim for malicious prosecution. The exemplary damages award, at the request of Kirk, was subsequently reduced to $118,980 so as not to exceed the amount of actual damages on Kirk's claim for malicious prosecution.[2] After the jury verdict, Kirk filed a post-trial motion in which he requested the district court to invalidate, as violative of several provisions of both the United States and Colorado Constitutions, the statutory requirement of section 13–21–102(4) that he pay one-third of any collected exemplary damages award to the state general fund. The district court denied the motion.

Kirk thereafter filed this appeal and invokes several federal and state constitutional provisions in challenging the one-third payment requirement of section 13–21–102(4). Denver Publishing Company

**2.** The statutory scheme for exemplary damages provides that an exemplary damages award must not exceed the amount of actual damages unless exceptional circumstances not present here justify an increase. §§ 13–21–102(1)(a) & 13–21–102(3), 6A C.R.S. (1987). Kirk and Den-

ver Publishing Company stipulated that the malicious prosecution claim, on which the exemplary damages award was based, arose subsequent to the effective date of the 1986 statutory scheme.

takes no position on the constitutionality of the statute. The Attorney General, however, has intervened as amicus and has filed a brief in support of the district court's declaration of constitutionality. We find it unnecessary to address all of Kirk's claims, as we conclude that the mandatory one-third payment requirement of section 13–21–102(4) violates the Taking Clause of the United States and Colorado Constitutions.[3] Our conclusion derives from the nature of an exemplary damages award as a private property right, the confiscatory character of the "taking" mandated by the statute, and the manifest absence of a reasonable nexus between the statutory taking of one-third of the exemplary damages award and the cost of any governmental services that arguably might support a significantly smaller forced contribution.

## II.

We begin our analysis by examining the nature of an award for exemplary damages.

### A.

Tort law generally provides for two types of monetary remedies for a civil wrong. Compensatory damages are intended to "make [the plaintiff] whole," *Bullerdick v. Pritchard,* 90 Colo. 272, 275, 8 P.2d 705, 706 (1932), while exemplary damages are intended to punish the wrongdoer and deter similar conduct in the future, *Seaward Construction Co., Inc. v. Bradley,* 817 P.2d 971, 974 (Colo.1991), *Leidholt v. District Court,* 619 P.2d 768, 770 (Colo.1980); *Mince v. Butters,* 200 Colo. 501, 503, 616 P.2d 127, 129 (1980). This is not to say that these two remedies are totally unrelated to and independent of each other. We implicitly recognized the interrelationship between compensatory and exemplary damages in *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 213–14 (Colo.1984), where we observed that a claim for exemplary damages is not "a separate and distinct cause of action," but rather "is auxiliary to an underlying claim for actual damages" and thus can be entered only in conjunction with an underlying and successful claim for actual damages assessed against a wrongdoer for a legal wrong to the injured party. So also, a claim for exemplary damages contemplates "tortious conduct," *Mortgage Finance, Inc. v. Podleski,* 742 P.2d 900, 902 (Colo.1987), and in that respect, requires, as does a claim for compensatory damages, some measure of legal fault. *See Harding Glass Co., Inc. v. Jones,* 640 P.2d 1123, 1126–27 (Colo.1982). Thus, while a compensatory damages award serves the reparative function of making the injured party whole, it also performs the secondary function of discouraging "a repetition of [the defendant's] wrongful conduct" by serving as a "warning to others who are inclined to commit similar wrongs." C. Morris, *Punitive Damages in Tort Cases,* 44 Harv.L.Rev. 1173, 1174 (1931).[4] In a somewhat similar

---

**3.** Kirk raises the following constitutional claims which we find it unnecessary to address: that section 13–21–102(4) violates procedural and substantive due process of law and equal protection of the laws guaranteed by the United States and Colorado Constitutions, U.S. Const. amend. XIV; Colo. Const. art. II, § 25; that the statute was enacted in contravention of the General Assembly's revenue-raising authority conferred by article X of the Colorado Constitution; that the statute impairs the obligation of Kirk's contingency-fee contract with his attorney in violation of the constitutional proscription against the impairment of contracts under the United States and Colorado Constitutions, U.S. Const. art. I, § 10; Colo. Const. art. II, § 11; and that the statutory taking authorized by section 13–21–102(4) contravenes the separation-of-powers doctrine set forth in article III of the Colorado Constitution.

**4.** This interrelationship between the reparative and admonitory functions served by compensatory damages has been explained as follows:

The large portion of our tort law in which liability is dependent on fault can only be used to compensate plaintiffs when there are defendants deserving of punishment. As long as the liability with fault rules are retained, the law of torts will have an admonitory function even though the doctrine of punitive damages is abandoned. So punishment in tort actions is not anomalous (if anomalous only means unusual); and punitive damage practice is only one of many means of varying the size of money judgments in view of the admonitory function. The function itself is inherent in the liability with fault rules, and is not dependent on the allowance of punitive damages. Punitive damages are ordinarily merely a means of increasing the severity of

fashion, a claim for exemplary damages, while clearly designed to punish and deter, contemplates that the trier of fact will fix the award only after giving due consideration to the severity of the injury perpetrated on the injured party by the wrongdoer.

## B.

In 1986, as part of tort-reform legislation, the General Assembly modified the preexisting statutory scheme for exemplary damages. Chap. 106, sec. 1, § 13–21–102, 1986 Colo.Sess.Laws 675–76. Section 13–21–102(1)(a), which substantially follows the initial Colorado exemplary damages statute enacted in 1889,[5] *see* 1889 Colo. Sess.Laws 64–65, states as follows:

> In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

The term "willful and wanton conduct" is defined as conduct "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." § 13–21–102(1)(b), 6A C.R.S. (1987). The 1986 statute states that the amount of reasonable exemplary damages "shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party." § 13–21–102(1)(a), 6A C.R.S. (1987). In keeping with the somewhat interrelated functions served by both compensatory and exemplary damages, however, the statutory scheme permits a court to increase an award of exemplary damages to a sum not to exceed three times the amount of actual damages if it is shown that the defendant during the pendency of the action has continued the injurious behavior against the plaintiff or others in a willful and wanton manner or has willfully and wantonly further aggravated the damages to the plaintiff when the defendant knew or should have known that such action would produce aggravation. § 13–21–102(3)(a) & (b), 6A C.R.S. (1987).[6]

The focal point of this case is section 13–21–102(4), 6A C.R.S. (1987), which states:

> One-third of all reasonable damages collected pursuant to this section shall be paid into the state general fund. The remaining two-thirds of such damages collected shall be paid to the injured party. Nothing in this subsection (4) shall be construed to give the general fund any interest in the claim for exemplary damages or in the litigation itself at any time prior to payment becoming due.

By its plain terms, section 13–21–102(4) contemplates the entry, and the actual collection, of a final judgment on behalf of the injured party, for it is only after the injured party has invested the time, effort, and expense of obtaining and actually collecting the judgment that the statutory grant of

---

the admonition of "compensatory" damages, and can only be criticized on that basis. C. Morris, *Punitive Damages in Tort Cases,* 44 Harv.L.Rev. 1173, 1177 (1931) (footnotes omitted).

5. Although exemplary damages were recognized at the common law as early as 1763, see *Huckle v. Money,* 2 Wils. 206 (K.B.1763), and the practice of awarding exemplary damages was well recognized when the United States Constitution was adopted, *see Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 274, 109 S.Ct. 2909, 2919, 106 L.Ed.2d 219 (1989), this court rejected the common law rule in *Murphy v. Hobbs,* 7 Colo. 541, 5 P. 119 (1884). In response to *Hobbs,* the General Assembly in 1889 enacted a statute permitting an award of reasonable exemplary damages "for a wrong done to the person, or to personal or real prop-

erty," when the jury, in addition to awarding actual damages, finds that "the injury complained of shall have been attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings." 1889 Colo.Sess.Laws 64–65.

6. Section 13–21–102(2), 6A C.R.S. (1987), authorizes a court to reduce or disallow exemplary damages to the extent that:

(a) The deterrent effect of the damages has been accomplished; or

(b) The conduct which resulted in the award has ceased; or

(c) The purpose of such damages has otherwise been served.

one-third interest to the state comes into play.

### C.

■ Property interests emanate from state law, and there is no question that under Colorado law a judgment for exemplary damages qualifies as a property interest.

The term "property" includes a multiplicity of interests and is commonly used to denote everything that is the subject of ownership, whether tangible or intangible, as well as those rights and interests which have value to the owner. *See Black's Law Dictionary* 1095 (5th ed. 1979). The concept of property, therefore, encompasses those enforceable contractual rights that traditionally have been recognized as choses in action. *Baker v. Young,* 798 P.2d 889, 893 (Colo. 1990).

Because the term "property" includes a "legal right to damage for an injury," *Rosane v. Senger,* 112 Colo. 363, 370, 149 P.2d 372, 375 (1944), it necessarily follows that the term "property" also includes the judgment itself, which creates an independent legal right to full satisfaction from the "goods and chattels, lands, tenements, and real estate of every person against whom any judgment is obtained." § 13–52–102(1), 6A C.R.S. (1987). The filing of a certified transcript of the judgment with the county clerk and recorder creates a "lien upon all the real property of such judgment debtor, not exempt from execution in such county, owned by him or which he may afterwards acquire until said lien expires." *Id.; see generally Evans v. City of Chicago,* 689 F.2d 1286, 1296 (7th Cir. 1982) (final judgment no longer subject to modification is vested property right); *Truax–Traer Coal Co. v. Compensation Comm'r,* 123 W.Va. 621, 17 S.E.2d 330, 334 (1941) (judgment is "property" and as such is proper subject of constitutional protection). Indeed, the statutory disavowal in section 13–21–102(4) of any state interest in a claim for exemplary damages "at any time prior to payment becoming due" is an implicit legislative acknowledgement of the property interest created in the judgment creditor by virtue of the judgment itself.

### III.

We next consider the concept of "taking" as it relates to the federal and state constitutional proscriptions against the governmental taking of private property without just compensation. The Fifth Amendment to the United States Constitution states in general terms that private property shall not "be taken for public use, without just compensation." This provision is made applicable to the states under the Fourteenth Amendment to the United States Constitution: *E.g., Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978). Article II, section 15 of the Colorado Constitution more specifically states that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation" and that "the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public."

### A.

The Taking Clause of both the federal and state constitutions is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co.,* 438 U.S. at 123, 98 S.Ct. at 2659; *see also Board of County Comm'rs of Saguache County v. Flickinger,* 687 P.2d 975, 983 (Colo.1984). Resolving the question of "what constitutes a taking" is a problem of considerable difficulty, and courts have been unable "to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Flickinger,* 687 P.2d at 983 (quoting *Penn Central Transp. Co.,* 438 U.S. at 124, 98 S.Ct. at 2659); *see Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (when

governmental regulation "goes too far it will be recognized as a taking").

■ The determination of whether a "taking" has occurred by reason of a governmental regulation interfering with or impairing the interest of a private property owner involves essentially an "ad hoc, factual" analysis. *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). In resolving a "taking" issue, the United States Supreme Court has considered the totality of circumstances underlying the taking, including such factors as the character of the governmental action, its economic impact, and its interference with reasonable economic expectations of the property owner. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Kaiser Aetna*, 444 U.S. at 175, 100 S.Ct. at 390. An additional factor, and one entitled to considerable weight, is whether the property right has ripened into a judgment. Where a private property interest emanates directly from a final judgment, the longstanding rule, announced by the Supreme Court in *McCullough v. Virginia*, 172 U.S. 102, 123–24, 19 S.Ct. 134, 141–42, 43 L.Ed. 382 (1898), and consistently followed by other courts, is that such a property interest cannot be diminished by legislative fiat:

> It is not within the power of a legislature to take away rights which have been once vested by a judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases.[7]

7. The facts in *McCullough* prompted the United States Supreme Court to preface its opinion with the statement that "[p]erhaps no litigation has been more severely contested or has presented more intricate and troublesome questions than that which has arisen under the coupon legislation of Virginia." 172 U.S. at 106, 19 S.Ct. at 135. The basic facts in *McCullough* were as follows. In 1871 the Virginia Assembly passed an act for the refunding of the public debt. The act authorized the issuance of new coupon bonds for two-thirds of the old bonds, thereby leaving the other one-third as the basis of an equitable claim upon the state. The statute provided that "[t]he coupons shall be payable semi-annually, and be receivable at and after maturity for all taxes, debts, dues and demands due the State, which shall be so expressed on their face." *Id.* at 103, 19 S.Ct. at 134. Under the 1871 act, therefore, a large amount of the state's outstanding debt was refunded. The refunding scheme, however, proved to be unpopular, and after 1871 there was repeated legislation tending to mitigate the effects of the 1871 statute. In 1872 the Virginia Assembly passed a statute stating that it shall not be "lawful for the officers charged with the collection of taxes or other demands of the State, due now or that shall hereafter become due, to receive in payment thereof anything else than gold or silver coin, United States Treasury notes, or notes of the national banks of the United States." *Id.* In a series of cases, the United States Supreme Court upheld state statutes authorizing the payment of taxes in coupon bonds. *E.g., Hartman v. Greenhow*, 102 U.S. 672, 26 L.Ed. 271 (1880); *Antoni v. Greenhow*, 107 U.S. 769, 27 L.Ed. 468 (1882); *Virginia Coupon Cases*, 114 U.S. 269, 5 S.Ct. 962, 29 L.Ed. 207 (1885); *Royall v. Virginia*, 121 U.S. 102, 7 S.Ct. 826, 30 L.Ed. 883 (1887); *McGahey v. Virginia*, 135 U.S. 662, 10 S.Ct. 972 (1890).

In 1882, the Virginia Assembly again passed a statute which, in effect, provided that a taxpayer seeking to use coupons in payment of his taxes should pay the taxes in money at the time of tendering the coupons and thereafter bring a suit to establish the genuineness of the coupons and that, if the suit be decided in the taxpayer's favor, the taxpayer would obtain from the treasurer a return of the money paid. The Virginia Assembly also passed in that year an act declaring that tax collectors should receive in payment of taxes and other dues "gold, silver, United States Treasury notes, national bank currency and nothing else." *Id.* at 104. This statute also contained a provision permitting a lawsuit by one claiming that such exaction was illegal and also provided that there shall be no other remedy and no writ of mandamus or prohibition or any other writ or process shall issue to hinder or delay the collection of revenue.

In 1892 McCullough filed an action in the Circuit Court of the City of Norfolk to establish the genuineness of certain coupons that he had tendered in payment of taxes. The action was commenced pursuant to the terms of the 1882 statute, which authorized the filing of such an action as the exclusive remedy for one challenging the requirement that taxes be paid in gold, silver, or United States currency. McCullough sought to establish the genuineness of certain coupon bonds for the payment of his taxes. The Circuit Court of the City of Norfolk rendered judgment in McCullough's favor, but in 1894, after the judgment was rendered, the Virginia Assembly repealed the 1882 statute authorizing the litigation commenced by McCullough.

*See generally Hodges v. Snyder*, 261 U.S. 600, 603, 43 S.Ct. 435, 436, 67 L.Ed. 819 (1923); *Daylo v. Administrator of Veterans' Affairs*, 501 F.2d 811, 816 (D.C.Cir. 1974); *Bond Bros. v. Louisville & Jefferson County Metropolitan Sewer Dist.*, 307 Ky. 689, 211 S.W.2d 867, 873 (1948); *Stone v. McKay Plumbing Co.*, 200 Miss. 792, 30 So.2d 91, 92–93 (1947); *Karrer v. Karrer*, 190 Neb. 610, 211 N.W.2d 116, 119 (1973); *Inman v. Railroad Comm'n*, 478 S.W.2d 124, 128 (Tex.Civ.App.1972); *City of Norfolk v. Stephenson*, 185 Va. 305, 38 S.E.2d 570, 575 (1946).

## B.

Because a judgment for exemplary damages entitles the judgment creditor to a satisfaction out of the real and personal property of the judgment debtor, the taking of a money judgment from the judgment creditor is substantially equivalent to the taking of money itself. In *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), the Supreme Court considered the constitutionality of a state statute authorizing a county to take the interest accruing on an interpleader fund deposited into the registry of the county court under circumstances where another statute imposed a fee for the clerk's services in receiving the fund into the registry. The Court rejected the notion that the statute created a valid fee for services and held that the county's retention of the interest fund violated the Taking Clause of the Fifth Amendment. Acknowledging that a state may deny a property owner the beneficial use of property or may restrict the owner's full exploitation of property so long as such action is justified as promoting the general welfare, the Court reasoned that the state had not merely adjusted the benefits and burdens of economic life to promote the common good, but had exacted "a forced contribution to general governmental revenues ... not reasonably related to the costs of using the courts," 449 U.S. at 163, 101 S.Ct. at 452, and then concluded:

> To put it another way: a State, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power.

*Webb's Fabulous Pharmacies*, 449 U.S. at 164, 101 S.Ct. at 452.

In contrast to *Webb's Fabulous Pharmacies*, the Court in *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), found no unconstitutional taking of money under a federal statute that required the Federal Reserve Bank of New York to deduct 1½% from the first $5 million dollars of an arbitration award entered by the Iran–United States Claims Tribunal. The purpose of the statutory deduction was to reimburse the United States government for the expenses incurred in the administration of the arbitration program. Acknowledging that the amount of a user fee need not "be precisely calibrated to the use that a party makes of government services," the Court concluded that the statutory deductions were not "so clearly excessive as to belie their purported character as user fees," stating:

The Supreme Court of Appeals of Virginia reversed the judgment in McCullough's favor, dismissed his petition, and awarded costs to the state. It was under this sequence of events that the United States Supreme Court held that the judgment rendered in the Circuit Court of the City of Norfolk pursuant to the 1882 act was rightfully entered and that the rights acquired by that judgment under the 1882 act could not be disturbed by the subsequent repeal of the statute in 1894.

The rule adopted in *McCullough* applies to private property rights acquired under a judgment and does not apply to an action to enforce a public right. An action to enforce a public right, "even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced; although, in so far as a private right has been incidentally established by such judgment, as for special damages to the plaintiff or for his costs, it may not be thus taken away." *Hodges v. Snyder*, 261 U.S. 600, 603–04, 43 S.Ct. 435, 436–37, 67 L.Ed. 819 (1923); *see Atlantic City Casino Assoc. v. City of Atlantic City*, 217 N.J.Super. 277, 525 A.2d 1109, 1113 (1985); *City of Norfolk v. Stephenson*, 185 Va. 305, 38 S.E.2d 570, 575 (1946).

This is not a situation where the Government has appropriated all, or most, of the award to itself and labeled the booty as a user fee.... We need not state what percentage of the award would be too great a take to qualify as a user fee, for we are convinced that on the facts of this case, 1½% does not qualify as a "taking" by any standard of excessiveness.

110 S.Ct. at 394–95 (citations and footnote omitted).

■ The rule to be gleaned from *Webb's Fabulous Pharmacies* and *Sperry* is that, in order to withstand a constitutional challenge to a governmental appropriation of a significant part of a money judgment under the Taking Clause of the United States Constitution, the governmental appropriation must bear a reasonable relationship to the governmental services provided to civil litigants in making use of the judicial process for the purpose of resolving the civil claim resulting in the judgment. We adopt that rule as the controlling norm for resolving the taking issue in this case.

### IV.

■ We turn to Kirk's claim that the requirement of section 13–21–102(4) that he pay to the state general fund one-third of all exemplary damages collected on his judgment constitutes a taking of private property without just compensation in violation of the Taking Clause of the United States and Colorado Constitutions. Although several types of revenue-raising and regulatory measures are available to a legislative body, we believe it will be helpful to briefly explain why the forced contribution of section 13–21–102(4) fails to satisfy the legal criteria for any of these measures.

■ Section 13–21–102(4) does not qualify as a valid penalty or forfeiture. The Colorado exemplary damages statute, we have held, is not a penal statute in the sense of creating a new and distinct cause of action for a civil penalty, but instead "merely authorizes increased damages ancillary to an independent claim for actual damages." *Palmer*, 684 P.2d at 214. As we previously observed, while a judgment

for exemplary damages is designed to punish the wrongdoer and deter similar conduct by others, it is only available when a civil wrong has been committed under extremely aggravating circumstances and when the injured party has a successful claim for actual damages against the wrongdoer. *Harding Glass Co., Inc.,* 640 P.2d at 112. In that sense, an exemplary damages award is not totally devoid of any and all reparative elements. More importantly, the forced contribution of one-third of the exemplary damages judgment is imposed not on the defendant wrongdoer who caused the injuries but upon the plaintiff who suffered the wrong. It goes without saying that placing the burden of payment on the judgment creditor who suffered the wrong bears no reasonable relationship to any arguable goal of punishing the wrongdoer or deterring others from engaging in similar conduct. *Cf. Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988) (statutory imposition of 15% penalty *on party who unsuccessfully appeals money judgment* upheld on basis that means chosen were sufficiently related to state's interest in discouraging frivolous appeals to satisfy Equal Protection Clause).

■ Section 13–21–102(4) does not satisfy the criteria for an *ad valorem* property tax. Where, as here, a statute's obvious purpose is to produce revenue for the state general fund, the statute must conform to the state constitutional requirement that all taxes upon each of the various classes of real and personal property be "uniform" and be levied under general laws prescribing such regulations as shall secure just and equal valuations of all property, whether real or personal. Colo. Const. art. X, § 3. In *Walker v. Bedford,* 93 Colo. 400, 26 P.2d 1051 (1933), this court invalidated a statute which imposed an additional registration fee upon motor vehicles based on their value. In so holding, we emphasized that the purpose of the statute was to raise general revenues but was applicable only to motor vehicles and to no other kinds of personal property. *Walker,* 93 Colo. at 405–06, 26 P.2d at 1053. In similar fash-

ion, section 13–21–102(4) is designed to raise revenues for the state general fund, but is limited only to personal property in the form of a judgment for exemplary damages and has no applicability at all to any other form of private property, real or personal.

■ Section 13–21–102(4) does not qualify as a valid excise tax. In contrast to a direct tax on property, an excise tax is not based on the assessed value of the property subject to the tax, but rather is imposed on a particular act, event, or occurrence. *Bloom v. City of Fort Collins*, 784 P.2d 304, 307 (Colo.1989); *Walker*, 93 Colo. at 403–07, 26 P.2d at 1052–53. "The object of an excise tax, like that of an *ad valorem* property tax, is to provide revenue for the general expenses of government, but, unlike the *ad valorem* property tax, the payment of the excise tax is made a condition precedent to the act, event, or occurrence on which the tax is based." *Bloom*, 784 P.2d at 307–08; *see Cherry Hills Farms, Inc. v. City of Cherry Hills Village*, 670 P.2d 779, 782 (Colo.1983). Even if we assume that an excise tax on a money judgment could survive a constitutional challenge under article II, section 6, of the Colorado Constitution, which mandates that justice "be administered without sale," section 13–21–102(4) imposes the burden of payment not on all persons using the civil justice system, nor for that matter on all successful plaintiffs, but only on those plaintiffs who obtain a judgment for exemplary damages and then only when the award is collected. An excise tax imposed only on such a limited class of persons exercising their right to use the courts, while other persons exercising the same right are not subject to the tax, would be so underinclusive as not to withstand even the rational-basis standard of review under equal protection analysis. *See generally Tassian v. People*, 731 P.2d 672 (Colo.1987) (chief judge's directive prohibiting pro se litigants from paying filing fees by personal check violative of equal protection of laws under Colorado Constitution).

■ The only conceivable justification for section 13–21–102(4) is that it constitutes a user fee imposed on plaintiffs who successfully utilize the civil justice system in obtaining an exemplary damages award. A user fee is in the nature of a special fee designed to defray the cost of a governmental service and is imposed on the users of that service. *See generally Bloom*, 784 P.2d at 308; *Loup–Miller Constr. Co. v. City and County of Denver*, 676 P.2d 1170, 1174–75 (Colo.1984). A valid user fee need not be designed with mathematical precision to defray the cost of the service for which the fee is imposed, but must bear some reasonable relationship to the overall cost of that service. *Bloom*, 784 P.2d at 308; *Loup–Miller Constr. Co.*, 676 P.2d at 1175–76.

■ Section 13–21–102(4) fails to qualify as a valid user fee. The payment required of the judgment creditor under section 13–21–102(4) is not allocated to the cost of funding the civil justice system, nor are the funds earmarked for a specific purpose remotely connected with the judicial process. In a manner similar to the statutory taking of interest on an interpleader fund invalidated in *Webb's Fabulous Pharmacies*, 449 U.S. 155, 101 S.Ct. 446, section 13–21–102(4) exacts a forced contribution in order to provide general governmental revenues and does so in a manner and to a degree not reasonably related to the cost of using the courts. The consideration received by judgment creditors subject to the forced contribution created by section 13–21–102(4) is the use of the courts in resolving their civil disputes. The General Assembly, however, has imposed filing fees and other fees on persons using the civil justice system in order to defray a significant part of the costs in funding that aspect of the judicial process. *See* §§ 13–32–101 to –104, 6A C.R.S. (1987 & 1990 Supp.); § 13–71–144, 6A C.R.S. (1990 Supp.). Section 13–21–102(4) thus has the effect of forcing a select group of citizens—persons who obtain a judgment for exemplary damages and are successful in collecting on the judgment—to bear a disproportionate burden of funding the operations of state government, which, "in all fairness and justice, should be borne by the public as a

whole." *Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 163, 101 S.Ct. at 452.

The fact that a legislative body might choose to eliminate exemplary damages in civil cases without offending due process of law is not to say that any restriction whatever on an exemplary damages award will pass constitutional muster. *See Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, ——, 111 S.Ct. 1032, 1054, 113 L.Ed.2d 1 (1991) (Scalia, J., concurring). In our view, forcing a judgment creditor to pay to the state general fund one-third of a judgment for exemplary damages in order to fund services which have already been funded by other revenue-raising measures, and without conferring on the judgment creditor any benefit or service not furnished to other civil litigants not required to make the same contribution, amounts to an unconstitutional taking of the judgment creditor's property in violation of the Taking Clause of the United States and the Colorado Constitutions. *Cf. Ochs v. Town of Hot Sulphur Springs,* 158 Colo. 456, 461–62, 407 P.2d 677, 680 (1965) (enforcement of municipal "frontage tax" on real property without any corresponding benefit to property results in "taking private property without compensation, and without due process of law").[8]

### V.

In urging us to uphold the constitutionality of section 13–21–102(4), the Attorney General argues that no taking occurs at all because a judgment creditor does not have a property interest in one-third of the judgment for exemplary damages. We find this argument devoid of merit.

▇▇▇ The legislature may well abate or diminish a pending civil action, but when that claim ripens into judgment "the power of the legislature to disturb the rights created thereby ceases." *McCullough,* 172 U.S. at 123–24, 19 S.Ct. at 141–142. Sec-

tion 13–21–102(4) passes the line of constitutional propriety by taking one-third of a collected civil judgment for exemplary damages notwithstanding the fact that the state has affirmatively disavowed, pursuant to the statute itself, "any interest in the claim for exemplary damages or in the litigation itself at any time prior to the payment becoming due." Such statutory taking of one-third of the collected judgment is direct and absolute, and its economic impact cannot be described as anything less than substantial.

To be sure, section 13–21–102(4) purports to create a state interest in one-third of the monies collected on the judgment and in that respect arguably might be read to defeat any reasonable economic expectation on the part of the judgment creditor to the total judgment. The statutory repudiation of any state interest in the tort litigation or in the judgment itself, however, affirmatively belies any notion that the judgment creditor's property interest in the judgment is less than total. Given the legislative disaffirmance of any stake in the exemplary damages award prior to collection, it would border on the fanciful were we to characterize the judgment creditor's expectation to a full satisfaction of the judgment as unreasonable, especially since upon entry of the judgment there is no preexisting claim on the part of the state to any part of the judgment. The state's asserted interest is not in the judgment itself but in the monies collected on the judgment, and that interest arises only at a point in time after the judgment creditor's property interest in the judgment has vested by operation of law. Moreover, the judgment itself results exclusively from the judgment creditor's time, effort, and expense in the litigation process without any assistance whatever from the state.

We need not turn this case, however, on a judgment creditor's reasonable economic expectation of a property interest in the

8. The only case we have found dealing with a statutory provision similar to section 13–21–102(4) is *McBride v. General Motors Corp.,* 737 F.Supp. 1563 (M.D.Ga.1990). In that case, the court held that section 51–12–5.1(e)(2) of the Georgia Tort Reform Act of 1987, which autho-

rized the state's taking of seventy-five percent of all punitive damages in products liability cases, was not rationally related to a legitimate state interest because the state provided no *quid pro quo* for the taking. 737 F.Supp. at 1575–77.

total judgment. We are satisfied that, even if the expectation issue is viewed as a close one, the cumulative effect of all factors bearing on the "taking" issue weighs heavily on the side of a constitutionally protected private property interest on the part of the judgment creditor in the exemplary damages award. These factors, as previously noted, include the following: the legislative renunciation of any interest in the judgment prior to collection; the absence of any demonstrable nexus between, on the one hand, any alleged governmental interest in punishing and deterring fraudulent, malicious, or willful and wanton tortious conduct and, on the other, the statutory imposition of the forced contribution on the person injured by the wrongful conduct; and the gross disproportion between the statutory forced contribution and any governmental service made available to the judgment creditor but not otherwise funded by fees and other statutory assessments imposed on civil litigants using the judicial process to resolve their disputes. We thus conclude that section 13–21–102(4) constitutes a taking of a judgment creditor's private property interest in an exemplary damages award without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article II, section 15, of the Colorado Constitution.

We accordingly reverse that part of the district court's judgment upholding the constitutionality of section 13–21–102(4), and we remand the case to that court with directions to conform its judgment to the views herein stated.

ROVIRA, C.J., dissents.

LOHR, J., joins in the dissent.

Chief Justice ROVIRA dissenting:

The majority holds that section 13–21–102(4), 6A C.R.S. (1987), results in a forced taking of a judgment creditor's property in violation of both the United States and Colorado Constitutions. Because I believe that a claim for exemplary damages is purely a statutory right and such a claim may be limited or conditioned by the legislature, no taking of a property right results

when an award of exemplary damages has been obtained pursuant to the statute. Accordingly, I respectfully dissent.

I

Based on plaintiff's claim for malicious prosecution against the Denver Publishing Company, a jury awarded him exemplary damages in the amount of $160,500. At the time plaintiff brought his claim, section 13–21–102(4) was in effect and provided that one-third of any exemplary damages award collected must be paid to the state general fund. In addition, section 13–21–102(1)(a) provided that exemplary damages should not exceed the amount of actual damages unless exceptional circumstances justify an increase. §§ 13–21–102(1)(a) and 13–21–102(3), 6A C.R.S. (1987). In order to comply with the statute, plaintiff requested that his exemplary damages award be reduced so as not to exceed the amount of actual damages awarded. Pursuant to his request, the trial court reduced the exemplary damages award to $118,980. Plaintiff also requested the trial court to find section 13–21–102(4) unconstitutional. The trial court refused.

On appeal plaintiff contends that the legislative requirement that a portion of an exemplary damages judgment actually collected be paid into the state's general fund is an unconstitutional taking of property. Although plaintiff has raised other constitutional issues, the majority relies only on the "taking" issue in arriving at the conclusion that the statute is unconstitutional.

II

The majority reasons that the entire judgment for exemplary damages is a property interest of the plaintiff and that if the state takes a portion such taking is unconstitutional.

To arrive at this conclusion, the majority examines the nature of an award for exemplary damages, and finds that compensatory damages and exemplary damages are related and dependent on one another, both having similar reparative functions. Compensatory damages serve a primary repara-

tive function of making the injured party whole, while exemplary damages, although designed to punish and deter, contemplate the severity of the injury perpetrated on the injured party by the wrongdoer as well, thus also serving a reparative function.

Because the term property includes a "legal right to damage for an injury," it follows that the term property includes the judgment itself. Maj. op. at 267 (quoting *Rosane v. Senger*, 112 Colo. 363, 370, 149 P.2d 372, 375 (1944)). According to the majority, because section 13–21–102(4) contemplates the entry and actual collection of a final judgment before the statutory grant of one-third interest to the state comes into play, the state is taking a property interest, violating the Fifth Amendment of the United States Constitution and article II, section 15 of the Colorado Constitution.

I do not dispute that a judgment is a property right. I also agree that a "taking" of a judgment without compensation would be unconstitutional. I disagree however, based upon facts and law applicable to this case, that the plaintiff has a right to the entire exemplary damages judgment. My disagreement is premised on the ground that a claim for exemplary damages is a statutory right which may be conditioned by the legislature and thus the entire judgment never vested in the plaintiff.

Exemplary damages were authorized by statute to punish and deter conduct attended by circumstances of fraud, malice or willful and wanton conduct. 1889 Colo. Sess.Laws 64–65. Although exemplary damages may have a negligible reparative function, it is well-established in Colorado that punishment and deterrence is the essential purpose of exemplary damages. *Seaward Constr. Co., Inc. v. Bradley*, 817 P.2d 971, 974 (Colo.1991); *Mince v. Butters*, 200 Colo. 501, 616 P.2d 127 (1980); *French v. Deane*, 19 Colo. 504, 511, 36 P. 609 (1894). The effort by the majority to establish a link between actual and exemplary damages due to their reparative functions is tenuous at best.

The uniqueness of exemplary damages is also demonstrated in the statute authoriz-

ing such damages. First, the wrong giving rise to exemplary damages must be attended by circumstances of fraud, malice, or willful and wanton conduct. Second, the amount of an exemplary damages award may not exceed the actual damages awarded without circumstances justifying an increase. Third, the court may reduce an exemplary damages award if the deterrent effect has been accomplished or if the purpose has been served. §§ 13–21–102(1)(a), (2)(a), & (c), 6A C.R.S. (1987). Finally, a claim for exemplary damages must be proven beyond a reasonable doubt, while compensatory damages may be proven by a preponderance of the evidence. One has a right to compensatory damages when one has suffered an injury, but exemplary damages are allowed only in very limited circumstances.

The two remedies may be interrelated, as the majority opinion suggests, but a claim for exemplary damages is unique and should not be viewed as a legal right which is any greater than that provided by statute.

Since a claim for exemplary damages arises from statute, such a claim may also be limited by statute. *Kaitz v. District Court*, 650 P.2d 553, 556 (Colo.1982). If the legislature may completely eliminate exemplary damages in civil cases, as the majority concedes, the legislature may also place conditions on a statutory grant of authority to recover such damages. The plaintiff recognized that the right to exemplary damages is a statutory right, and that right is subject to legislative conditions. Plaintiff accepted the condition pursuant to section 13–21–102(1)(a) which provides that exemplary damages must not exceed the amount of actual damages, when he requested that the exemplary damages award be reduced from $160,500 to $118,980. Thus, plaintiff concedes that exemplary damages may be limited by the legislature.

The legislature cannot modify a judgment which is a property right, but the legislature is free to condition a claim for exemplary damages which is allowed only

pursuant to a statutory grant.[1] "It is true that the legislature can not pass an act depriving a citizen of any vested right, but to be a vested right, '[i]t must be something more than a mere expectation based upon an anticipated continuance of the existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property....'" *Smith v. Hill*, 12 Ill.2d 588, 592, 147 N.E.2d 321, 325 (1958) (quoting *People ex rel. Foote v. Clark*, 283 Ill. 221, 222, 119 N.E. 329, 330 (1918)). The Illinois court went on to hold that a plaintiff is entitled to a cause of action for damages actually sustained, but a vested right to exemplary damages arises only when such damages have been allowed by a judgment. "There being no vested right in any plaintiff to exemplary, punitive, vindictive or aggravated damages the legislature may therefore restrict or deny the allowance of such damages at its will." *Smith*, 147 N.E.2d at 325.

Any property right plaintiff may have in the award is limited as provided by the statute. When the statute became effective, plaintiff had a "mere expectancy" in a possible future exemplary damage award. This expectancy was conditioned by one-third going to the state, and plaintiff was aware of this at the time he filed his complaint.[2]

Section 13–21–102(4) repudiates any state interest in the tort litigation and prevents collection by the state until the plaintiff has collected the exemplary damages judgment. The majority reasons that this statutory provision supports its conclusion that the judgment creditor has a full property interest in the entire exemplary damages award. I disagree. The legislature, by that provision, has sought to protect the plaintiff's interests by conditioning the state's right to receive payment until the judgment has been collected. Since the state is only entitled to receive its portion of the exemplary damages award after collection has been successful, the plaintiff is not harmed.

The majority is concerned that the "forced contribution of one-third of the exemplary damages judgment is imposed not on the defendant wrongdoer ... but upon the plaintiff who suffered the wrong." Maj. op. at 270. I disagree. There is minimal burden placed on the plaintiff where, as here, the plaintiff had a mere expectancy in exemplary damages, and where only a portion of that received is contributed to the state. Furthermore, the state's receipt of one-third of an exemplary damages judgment does not negate the punishment of the wrongdoer. The wrongdoer must pay the entire exemplary damages judgment regardless of who receives it.

It is not unreasonable for the legislature to condition an exemplary damage award where the purpose behind exemplary damages is to punish the wrongdoer and deter dangerous or malicious conduct. The legislature has recognized that exemplary damages are allowed for the benefit of the public. In exercising its legislative powers, the legislature appropriately decided that the goal of benefitting society through exemplary damages awards required a portion of exemplary damages awards be paid to the state.

As I do not believe that the statute violates the taking clause of either the Colorado or the United States Constitutions, I am confronted with the other constitutional claims not addressed in the majority opinion.[3] Because the majority reverses on the

**1.** Non-economic damages have also been limited by statute in order to prevent undue burden on economic, commercial, and personal welfare. § 13–21–102.5, 6A C.R.S. (1987).

**2.** Expressed alternatively, a plaintiff's property right in a judgment for punitive damages is intrinsically subject to partial defeasance upon collection by reason of the statutory scheme in place at the time of entry of judgment. A plaintiff receives the full benefit of the property right so described; there is no taking.

**3.** *See* maj. op. at 265 n. 3.

taking clause issue it would serve no worthwhile purpose to consider the other constitutional issues raised by the plaintiff. I respectfully dissent.

I am authorized to state that JUSTICE LOHR joins in this dissent.